John W. BERTOGLIO, James J. Ling, and Matrix, Inc., Plaintiffs,

v.

TEXAS INTERNATIONAL COMPANY, Defendant.

TEXAS INTERNATIONAL COMPANY, Counterclaimant,

v.

James J. LING, John W. Bertoglio, and Texas International Company Stockholders Committee, Defendants on the Counterclaim.

Civ. A. No. 79–242.

United States District Court, D. Delaware.

March 7, 1980.

Opinion on Motion for Reargument March 28, 1980.

Richard L. Sutton, Martin P. Tully, A. Gilchrist Sparks, III, and Donald F. Parsons, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., of counsel; James S. Ramsey, Jr., Richard Hull, and Timothy A. Duffy, Crutcher, Hull, Ramsey & Jordan, Dallas, Tex., for John W. Bertoglio, James J. Ling and Matrix, Inc.

William Prickett and Michael J. Hanrahan, Prickett, Sanders, Jones, Elliott & Kristol, Wilmington, Del., of counsel; Daniel S. Greenfeld, Robert L. Poyourow, and Fred N. Gerard, Marshall, Bratter, Greene, Allison & Tucker, New York City, Fred Bartlit, J. Landis Martin, George A. Joseph, and Philip J. Davis, Kirkland & Ellis, Chicago, Ill., for Texas Intern. Co.

OPINION

MURRAY M. SCHWARTZ, District Judge.

This action arose out of a proxy contest between the plaintiffs and the incumbent management of defendant Texas International Company ("TI" or "Company") in which three members of TI's staggered ten-member Board of Directors were to be elected. Both sides allege that the proxy materials sent by their opponents to the TI shareholders prior to the Company's May 31, 1979 annual shareholders' meeting were violative of Section 14(a) of the Securities

and Exchange Act of 1934 ("Act"),[1] 15 U.S.C. § 78n(a), and the Rules promulgated thereunder by the Securities and Exchange Commission ("S.E.C.").[2]

Plaintiffs John W. Bertoglio ("Bertoglio"), James J. Ling ("Ling"), and Matrix, Inc. ("Matrix"), a corporation privately owned by Ling, commenced this action on May 16, 1979. Their complaint sought preliminary and permanent injunctive relief against TI by virtue of TI's alleged proxy violations. On May 17, 1979, TI filed a counterclaim against Ling, Bertoglio and the Texas International Company Stockholders Committee ("Committee"),[3] an unincorporated association formed by Ling and Bertoglio. The counterclaim also sought preliminary and permanent injunctive relief against the counterclaim defendants as a result of their alleged proxy violations.

On May 25, 1979, plaintiffs' motion and defendant's cross-motion for preliminary injunctive relief were heard. Both were denied in a May 29, 1979 Opinion and Order entered by this Court. Subsequent to that Order and the May 31, 1979 Annual Meeting, the complaint and counterclaim were amended on various dates, the last of these occurring at trial, when plaintiffs twice were permitted to amend their complaint pursuant to Fed.R.Civ.P. 15(b). As a result of these amendments, defendant now seeks an award of damages on its counterclaim, and both sides continue to seek permanent injunctive relief.

A five-day bench trial was held on October 9–12 and 15, 1979 at which only two witnesses testified. By agreement of the parties, all other evidence was put before the Court in the form of deposition excerpts and documents. Post-trial briefing and argument were concluded on November 27, 1979. Jurisdiction and venue reside in this Court by virtue of Section 27 of the Act, 15 U.S.C. § 78aa.

The following facts have been admitted by the parties. Bertoglio is a resident of the State of Florida and, as of May 14, 1979, owned beneficially, directly or indirectly, 269,000 shares of Common Stock of TI. Ling is a resident of the State of Texas and owns all of the issued and outstanding common shares of plaintiff Matrix, a Texas corporation. Matrix has its principal place of business and executive offices in Dallas, Texas. As of May 14, 1979, Matrix owned beneficially, directly or indirectly, 191,600 shares of TI Common Stock.

TI is a Delaware corporation. Its principal place of business and executive offices are in Oklahoma City, Oklahoma. It is principally engaged, through its two main operating divisions, in the manufacture of oil field equipment and the exploration for and production of crude oil and natural gas. TI's Common Stock is registered pursuant to Section 12(b) of the Exchange Act and is publicly traded on the New York Stock Exchange, and other exchanges. At all rel-

1. Section 14(a) of the Act provides:
 It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

2. Most of the allegations in this case involve Rule 14a 9, 17 C.F.R. § 240.14a 9, which provides in pertinent part:
 (a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

3. As originally filed, the counterclaim also named Hambro America Incorporated ("Hambro") as a defendant. By stipulation between the parties, the counterclaim was dismissed as to Hambro on September 7, 1979.

evant times, the number of shares of TI's Common Stock which were issued and outstanding was 9,464,212 shares. The TI Board of Directors has ten members divided into three classes, with the seven directors comprising Class II and Class III serving terms that will expire in 1980 and 1981. The election of Class I directors, comprising three positions on the Board, was submitted to the shareholders at the 1979 Annual Meeting.

By action of TI's Board of Directors on February 27, 1979, the 1979 Annual Meeting of Stockholders was set for May 11, 1979, and TI designated as nominees for election at the Annual Meeting as Class I directors the following three officers of TI: Messrs. George Platt ("Platt"), Delwin C. Stults ("Stults") and Earl E. DeFrates ("DeFrates"). At that meeting, a record date of April 9, 1979 was set for determining the stockholders entitled to vote. By action of TI's Board of Directors on April 18, 1979, the Annual Meeting was rescheduled for May 31, 1979 at Oklahoma City, Oklahoma. Ling and Bertoglio decided to oppose TI's nominees for election of directors and to seek proxies from TI's stockholders for the election of themselves and Ronald A. Shiftan ("Shiftan"), a partner in the investment banking firm of Bear, Stearns & Co. ("Bear, Stearns"), as Class I directors of TI.

The Annual Meeting was convened on May 31, 1979, at Oklahoma City, Oklahoma, for the receipt of stockholders' proxies and ballots and was thereafter from time to time adjourned to permit the counting of proxies and ballots. On August 10, 1979, the final results of the voting at the Annual Meeting were reported by the Inspectors of the Election to TI as follows: TI's nominees for Class I directors, Platt, DeFrates and Stults, were elected by 2,739,336 votes to 2,546,811 votes for the plaintiffs' nominees. Ling and Bertoglio and the Committee advised TI that they declined to seek a review of such election results in the Delaware Court of Chancery as permitted by the Delaware General Corporation Law.

In connection with the solicitation of proxies for the election of Class I directors at the Annual Meeting, TI's communications with stockholders entitled to vote at that meeting included a proxy statement mailed to stockholders on May 7, 1979 and May 8, 1979, and a letter from management and a two-page supplemental proxy statement mailed to stockholders on May 19, 1979. The communications of Ling, Bertoglio and the Committee with stockholders entitled to vote at the meeting included a letter to shareholders dated May 11, 1979 and mailed May 14, 1979, and a proxy statement dated and mailed May 17, 1979. Initial S.E.C. Schedules 14B were filed with the S.E.C. on behalf of Bertoglio, Ling and the Committee on Tuesday, May 8, 1979 and on behalf of Shiftan, Matrix and Gold Crown Resources, Inc., a corporation formed by Ling and Bertoglio, on May 14, 1979.

The events which were to culminate in this litigation spanned several months. On March 9, 1979, TI Vice-President Robert C. Gist ("Gist") and James Kishpaugh, the President of Phoenix Resources, Inc., a publicly-held company of which TI owns approximately 51% of the stock, met with Ling and Bertoglio at Bertoglio's house in Florida. During the weekend following the March 9, 1979 Florida meeting, TI's management suggested and arranged a March 13–15 meeting with Ling and Bertoglio in New York City. Ling and Bertoglio were aware that TI's management was willing to consider any *bona fide*, concrete offer to acquire TI.

Gist and another TI executive met with Ling and Bertoglio on March 13, 1979 in New York. Following this March 13 meeting, TI's senior management discussed the proposal. TI's Chairman, George Platt, expressed doubt that two individual investors possessed the financial strength to handle a $170 million deal. However, TI's management decided not to discard the idea of a possible transaction with Ling and Bertoglio without further investigation of Ling and Bertoglio's ability to finance their proposal.

A second New York meeting was held on March 14, 1979. TI asked Ling for evidence of the financial capability of the two individuals to finance a $170 million deal. At the conclusion of the March 14 meeting, TI's management told Ling and Bertoglio that the Board "stood ready and willing at any time to give full and fair consideration to a bona fide offer to purchase Texas International Company backed by sound evidence of financial capability to perform."

Prior to May 7, 1979, TI had mailed to its shareholders a letter stating among other things, that (i) management was in possession of a report prepared by an independent financial analyst stating that TI had a liquidation value of approximately $18.50 per TI share and (ii) management, based on its own calculations, had estimated that the liquidation value of TI would be well in excess of $20 per TI share.

Prior to this proxy contest, the all-time high market price in TI common stock was in 1969 when it reached 16⅜. The following is the range of market prices in TI common stock during the five years preceding the proxy contest:

| 1974 | High | 12⅞ | Low | 3⅜ |
| 1975 | High | 10¾ | Low | 5¼ |
| 1976 | High | 9⅝ | Low | 5¼ |
| 1977 | High | 12⅜ | Low | 7¾ |
| 1978 | High | 11⅛ | Low | 5⅝ |

On March 8, 1979, the last trading day before TI publicly announced the existence of Ling and Bertoglio's interest in TI, the stock traded from a high of 10⅝ to a low of 9⅝.

In addition to the facts stipulated by the parties, the Court finds the following facts, many of which will be discussed more fully in connection with the alleged violations to which they relate. In their meetings with TI management in March, 1979, Ling and Bertoglio, who had acquired large amounts of TI stock, told Gist that TI was "an immediate subject of a tender offer" by several unnamed "gorillas," who would probably fire TI management and liquidate the Company. (Tr. 246–47).[4] Ling and Bertoglio indicated their willingness to make a "friendly" tender offer for all the outstanding shares of TI. (Tr. 247–50). As these discussions began to focus on more precise terms, TI management asked Ling and Bertoglio for evidence of their capability to raise the approximately $170 million necessary to finance the acquisition. (Tr. 269–70). Various letters from financing institutions provided to TI by Ling and Bertoglio proved unsatisfactory to management, and on April 18, 1979 the TI Board of Directors announced that it was terminating any discussion or negotiation concerning the offer because of insufficient evidence of financing. (Tr. 313–15; TI Ex. 35). Plaintiffs subsequently decided to oppose the three incumbent directors seeking reelection at the Annual Meeting, and initiated a proxy contest to that end.

There were three issues on which the shareholders voted at the Annual Meeting. Along with the election of three directors, shareholders were asked to approve the Texas International Company Stock Appreciation Rights Plan of 1979 ("SAR Plan"), and to ratify the appointment of Price Waterhouse & Co. as independent auditors of TI. (PX 6). Both sides in the proxy contest favored the appointment of Price Waterhouse & Co. (TI Ex. 5 at 15; PX 16 at 1). TI urged adoption of the SAR Plan, while plaintiffs vigorously opposed it. (TI Ex. 5 at 13–15; PX 16 at 4–6).

As to the election of directors, each side naturally advocated the election of its nominees. In so doing, each adopted a "campaign platform" setting forth its views on the predominant issue of selling or liquidating the Company. Plaintiffs sought to convince the shareholders that a sale or liquidation of TI was the best way to maximize the shareholders' investment, while TI argued that the Company should be maintained as an ongoing concern. (PX 16 at 2–4, 12–13; TI Ex. 6 at 1–3).

---

4. "Tr." refers to the trial transcript, "PX" to the plaintiffs' exhibits, "TI Ex." to the defendant's exhibits, "___ Dep." to the deposition testimony of the named witnesses, "___ Dep. Ex." to an exhibit accompanying the witness' deposition, and "AF" to the admitted facts contained in the Pre-Trial Order.

The dispute before the Court concerns only the election of the three incumbent members of the Board of Directors. Accordingly, the materiality of all alleged misrepresentations or omissions must be evaluated by determining their importance to a shareholders' decision on which nominees he or she would support.

While plaintiffs initiated the debate over the wisdom of selling or liquidating the Company, the Court need not apply different disclosure requirements to the parties. Both sides chose to state their views on the sale or liquidation issue, and both offered their reasons in support of those views in their respective proxy solicitations. Both therefore assumed a statutory obligation to make complete and accurate disclosures of all facts that were material to the issues before the shareholders.

ALLEGED PROXY VIOLATIONS BY TI

I. THE ALLEGED FAILURE BY TI TO DISCLOSE ITS DECISION TO ATTEMPT TO FIND AN INVESTOR FOR A MAJOR BLOCK OF COMMON STOCK

Management's opposition to the Ling/Bertoglio plan was voiced to the shareholders in management's Supplemental Proxy Material, which stated, "YOUR MANAGEMENT BELIEVES THAT A LIQUIDATION OR SALE OF THE COMPANY AT THIS TIME IS NOT IN THE SHAREHOLDERS' BEST INTERESTS." The document went on to state, "In our opinion, the Ling-Bertoglio proposal is just plain bad business judgment. Now is not the time to sell or liquidate Texas International." (PX 17).

Plaintiffs contend that these statements, and others like them, are materially misleading in several respects, and therefore violate § 14(a) of the Act and Rule 14a–9 promulgated thereunder, 17 C.F.R. § 240.-14a–9. Plaintiffs' first allegation concerns efforts by TI management, undertaken in April, 1979, to find an equity investor for a major block of TI shares.

TI executives have stated that TI's bank indebtedness was too high, having carrying charges approaching $20,000,000 per year. (PX 73 at 54–58; PX 53 at 298). One step taken by management to reduce this debt was the sale in December, 1978 of the Company's well servicing operations. According to TI's Annual Report, which was mailed concurrently with the TI proxy materials, this sale resulted in a projected annual savings of $12 million in interest charges. (PX 8 at f1). Nevertheless, management concluded that TI continued to be too highly leveraged and that additional measures were warranted. (PX 53 at 290–91).

On April 17, 1979, TI's Executive Committee met "to consider the alternatives available to the Board concerning the course of action to be followed by the Company." (PX 2). The Board of Directors was advised on April 18, 1979 that the Executive Committee had considered the following options:

(1) liquidate the Company and get the best possible price for the benefit of the stockholders; (2) consider a negotiated takeover of the Company; (3) find a more suitable buyer for the Company or its assets; or (4) remain in business as an independent entity with the hopes of finding, with the assistance of E. F. Hutton, a person or persons in a different line of business who would purchase a major block of the Company's equity securities. (*Id.* at 2).

The Executive Committee concluded that it was in the best interests of the Company to pursue the last of these four alternatives. (*Id.*). However, the Board was advised by Mark L. Shapiro, a vice-president of E. F. Hutton who was present at the April 18 Board meeting, that "the probability of finding some person to invest a substantial amount of money in the Company was less than 20%." (*Id.* at 4; PX 55 at 58).

Plaintiffs allege that Shapiro then told TI management it had a better chance of finding an equity purchaser by offering a control block of TI common stock. This option was not presented at the April 18 Board meeting, but was developed instead in "sub-

sequent discussions" with TI management. (PX 55 at 66–67). While TI has not rejected this option as a viable method of alleviating its cash flow problems and remains open to being "upstream[ed]" into another company (PX 73 at 57–59), it has taken no steps to sell a majority of the Company's stock. (Tr. 385–86).

In support of their claim that management failed to disclose material facts in connection with this search for an equity investor, plaintiffs contend that management was prepared to embark on a sale of control of the Company in order to raise the needed equity. This position, plaintiffs assert, contradicted management's representation to the shareholders that "now is not the time to sell" the Company. According to plaintiffs, management should have told the shareholders that plans were underway to sell a control block of stock, and that such a sale posed the threat of a substantial dilution of the shareholders' investment.[5]

In examining a claim of a material misrepresentation or omission under § 14(a) of the Act and Rule 14a–9, the starting point must be the definition of materiality enunciated in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976):

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . . Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.* at 449, 96 S.Ct. at 2132. Plaintiffs urge, of course, that the *TSC Industries* standard

of materiality has been met, and rely additionally upon *Kass v. Arden-Mayfair, Inc.*, 431 F.Supp. 1037 (C.D.Cal.1977), and *Gladwin v. Medfield Corp.*, 540 F.2d 1266 (5th Cir. 1976), for the proposition that TI had a duty to disclose its search for an equity investor.

Both *Kass* and *Gladwin* involved undisclosed efforts to sell major assets of the respective corporations. In *Kass*, the defendant corporation was engaged in the operation of dairy facilities and a chain of supermarkets. Proxy materials mailed in connection with the election of five members of the defendant's board of directors failed to inform the shareholders that the Company was negotiating the disposition of its Southern California dairy facilities. These facilities were "important Company assets," accounting for $50–$60 million in annual sales. The court stated that if the defendants had pledged their opposition to liquidating the Company in their proxy materials, "serious negotiations" aimed at disposal of such major assets would be of interest to shareholders and should have been disclosed.[6] 431 F.Supp. at 1044, 1048.

In *Gladwin*, the defendant corporation was in the business of managing health facilities. In the course of a proxy contest for the election of directors, the defendant's proxy materials stated that it was hopeful the profitability of two particular nursing homes would increase. The defendant did not disclose that it was attempting to sell those very same facilities. The court concluded that the contemplated sale of these assets would be important to stockholders in voting at the annual meeting, and that failure to disclose these efforts violated § 14(a) of the Act and the applicable proxy rules.[7] 540 F.2d at 1271.

---

**5.** Plaintiffs point to a proposed merger between TI and NFC Corporation, announced October 3, 1979, as evidence of the "dilution" threat to the shareholders' investment. (PX 90). The very extensive record in this case, however, is virtually devoid of information concerning that proposed merger. Thus, its evidentiary weight is negligible.

**6.** Preliminary injunctive relief was denied on other grounds in *Kass*. The court's considera-

tion of the alleged non-disclosures arose in its evaluation of plaintiffs' likelihood of prevailing on the merits.

**7.** The court also rejected defendants' contention that disclosure was not required because shareholder approval of the sale of these facilities was unnecessary under applicable state law.

Neither holding controls the instant case. As stated earlier, TI's high annual interest expenses and its existing cash flow problems prompted the Board to seek a passive equity investor with the assistance of E. F. Hutton. Such a transaction, if consummated, would have been one of several normal business practices available to TI that was fully consistent with management's professed intent to remain in business. (Tr. 384; 506–07). Moreover, TI was advised almost immediately by E. F. Hutton that the prospects of finding such an investor were remote. TI's slim chance of implementing a plan that was not inconsistent with the position adopted in its proxy materials stands in marked contrast to the facts in *Kass* and *Gladwin*, were serious and ultimately successful negotiations toward transactions inconsistent with positions espoused in proxy materials were withheld from the shareholders.

If TI's version of the proposed transaction is accepted, *viz.*, that a passive investor was sought in order to shore up a weak cash flow situation, no disclosure was required. Rule 14a–9 prohibits the nondisclosure of material information. It does not require that management, having submitted to the shareholders a proposed direction for the corporation, disclose to them each ministerial function designed to implement that plan. This is especially true here, where management knew almost immediately that a passive investor was unlikely to surface. In short, there was nothing of consequence that management could have told the shareholders about this proposed transaction.

Plaintiffs have alleged that TI was willing to do more than sell a block of equity shares. They contend that management was prepared to sell a controlling interest in TI to some outside party at the same time that shareholders were being told that a sale of the Company was "bad business judgment." TI disputes this allegation. Mr. Gist testified at trial that TI's management has taken no steps, nor has anyone been authorized to take steps, to sell a controlling interest in TI. (Tr. 385–86).

In support of their allegation, plaintiffs rely principally upon the deposition testimony of Mr. Platt, TI's chief executive officer. In discussing E. F. Hutton's assessment that the chances of finding an equity investor were remote, Platt said:

Q: Was one of the considerations that [E. F. Hutton] gave you for it being remote that such a participant would be difficult to find unless they could have control?

A: No. We were open to that; we weren't adamant as to control.

Like I say, we recognized that one of the candidates, potential candidates could be a company not in the energy business that wants to take step one, which would be a large equity investment, to acquire a position in Texas International and then, at a subsequent date, complete a merger where Texas International then became merged upstream into another company, and with an Energy Division of a wholly different business-related corporation.

Whatever was best for our stockholders, we would do.

\* \* \* \* \* \*

We were wide open. We didn't know who was going to come out of the woodwork.

It could be anybody from, as I say, somebody wanting to buy and sell stock and make a profit, to merging upstream.

(PX 73 at 58–59). In addition, Mr. Shapiro of E. F. Hutton confirmed that an offer of a controlling interest in TI was one of the alternatives available to TI that would improve the probability of finding an investor. While this alternative was not presented at the April 18 Board meeting, it was being discussed with TI executives at the time of the proxy contest. (PX 55 at 66–67).

At most, this evidence establishes that TI was considering the possibility of a negotiated sale of control of the Company. It does not establish that management had plans for a prompt sale of a control block of stock. No negotiations were underway, nor was a prospective purchaser even identified.

The holding in *Jewelcor, Inc. v. Pearlman*, 397 F.Supp. 221 (S.D.N.Y.1975), is particularly instructive. There, shareholders of Lafayette Radio Electronics Corporation were being solicited to approve an amendment to the certificate of incorporation that would change the structure and terms of the Board of Directors, to approve another amendment to require a ⅔ vote of shareholders to amend the first proposal, and to elect four directors. The plaintiff alleged that the undisclosed purpose of these amendments was to prevent a successful takeover attempt by it, and more to the point, that the Lafayette directors had failed to disclose their preparation of a tender offer for Lafayette stock for the purpose of going private in the event that plaintiff made a tender offer. The court concluded:

There is evidence tending to show that Lafayette had considered a tender offer for its own stock, but there is also evidence indicating that it did not have present plans for such a tender offer, and that "going private" was merely one alternative under consideration to combat a threatened takeover by Jewelcor. . .

In the absence of clear evidence that Lafayette had more than a contingency plan to make a tender offer for its own stock, we are of the opinion that such proxy disclosure was not required. (Record citations omitted).

*Id.* at 247–48.[8]

◼ Thus, in a case much like the instant one, where a contemplated course of action was merely one of several alternatives receiving consideration, rather than a concrete plan undergoing active implementation, failure to disclose was not a violation of § 14(a) of the Act or Rule 14a–9. In the case at bar, plaintiffs have failed to demonstrate that TI was engaging in ongoing efforts to sell a controlling interest in the Company at the time of the proxy contest. Management's unwillingness to foreclose the possibility of a sale of control at some undetermined point in the future is not inconsistent with its proxy statement that "Now is not the time to sell or liquidate Texas International." Consequently, TI has not deprived its shareholders of material information in connection with the matter on which their votes were sought.

## II. THE ALLEGED FAILURE BY TI TO DISCLOSE ITS VULNERABILITY TO A CASH TENDER OFFER

Plaintiffs next allege that the TI proxy materials were deficient because of their failure to warn the shareholders of the risks attending management's proposal to maintain the Company as an ongoing concern. More specifically, TI is alleged to have been an obvious target for an unfriendly takeover attempt at a price that would not reflect the "intrinsic value" of the shareholders' investment. The proxy materials did not mention this vulnerability, nor did they discuss any of TI's efforts to prepare for a tender offer. Plaintiffs contend that failure to disclose these facts constituted a material omission in violation of § 14(a) of the Act and Rule 14a–9 promulgated thereunder.

TI concedes that management has recognized for several years that the Company was vulnerable to a takeover attempt. (PX 173 at 41–42). This vulnerability was caused primarily by the low concentration of TI stock in management's hands, the undervaluation of the market price of TI stock in comparison with its liquidation value, and the "retail" nature of the stock, with few large institutional investors. (*Id.*; Tr. 453–55). TI disputes the contention that such a tender offer would not adequately compensate the shareholders for their investment.

As plaintiffs describe the undisclosed "risk" of staying in business, TI shareholders were likely to be faced with a tender offer for their stock at a price sufficiently above the market price to be successful, and yet significantly below the liquidation value

---

8. While denying preliminary injunctive relief, the court in *Jewelcor* left open the possibility that plaintiff might prevail on this point after a full trial if it could produce sufficient evidence to demonstrate the firmness of the Lafayette directors' plan. *Id.* at 248.

of the stock. In that event, TI management would be unable to find a "white knight" who would make a competing tender offer at a price more reflective of liquidation value. Nevertheless, plaintiffs argue management chose to gamble on finding just such a "white knight," and to that end retained E. F. Hutton for the purpose of finding a tender offeror more acceptable to management in the event of an unfriendly takeover attempt.

It should be noted that plaintiffs' only record support for the proposition that a "white knight" would be difficult to find is an excerpt from Mr. Gist's deposition testimony. (PX 53 at 82). However, Gist testified at trial that his deposition testimony was being used out of context, and that he did not believe that a competing tender offeror would be difficult to find. (Tr. 519–20). If the Court were to accept plaintiffs' proposition despite the paucity of specific record support, it could be done only by drawing such an inference from the fact of TI's vulnerability to a tender offer, from a prediction as to the likely behavior of TI's shareholders, and from a general understanding of market activity. That is precisely the reason that plaintiffs' claim cannot succeed.

TI's shareholders were equally capable of drawing their own conclusions from these factors, all of which were available to them. The actual emergence of a tender offer, the price of such an offer, and the reactions of fellow shareholders and the presence or absence of alternative offerors are nothing more than speculation. Section 14(a) of the Act and Rule 14a–9 do not require, and in fact do not condone, speculation and predictions by proxy solicitors as to future market activities. Rather, disclosure of material *facts* is required.

In *Umbriac v. Kaiser*, 467 F.Supp. 548 (D.Nev.1979), the plaintiffs alleged that their alternative liquidation plan would have been more profitable than the plan actually supported by management and approved by the shareholders, and that management's proxy materials failed to disclose the potential benefits of this alternative

plan. In rejecting plaintiffs' claim, the court stated that "management is not required to set before shareholders information only suggestive of mere possibility," nor was management "required to discuss the panoply of possible alternatives to the course of action it is proposing." 467 F.Supp. at 553. *See TSC Industries, Inc. v. Northway, Inc., supra,* 426 U.S. at 462–63, 96 S.Ct. at 2138–39.

█ In the instant case, management advocated a policy of maintaining TI as an ongoing concern. Adoption of that policy gave rise to the possibility that the chain of events suggested by plaintiffs would transpire. It was equally possible, however, that no tender offer would be forthcoming, or that the price of a tender offer would reflect the intrinsic value of the stock. Discussion in the TI proxy materials of the Company's vulnerability to a tender offer, predictions as to the price of a tender offer, and statements concerning the availability of a "white knight" would have been "information only suggestive of mere possibility." TI was under no duty to include such information in its proxy materials.

### III. THE ALLEGED FAILURE BY TI TO DISCLOSE ITS FIRST QUARTER LOSSES IN ITS MAY 19 SUPPLEMENTAL PROXY MATERIAL

At the May 15, 1979 Board of Directors meeting, the TI Board was informed by Mr. DeFrates, the Company's then chief financial officer, that TI had sustained a loss of $2,083,000 or $.22 per share, for the first quarter of 1979. This compared with a 1978 first quarter loss of $172,000, or $.02 per share. Plaintiffs concede that TI management was not aware of the precise amount of the 1979 first quarter loss before May 15. Mr. DeFrates ascribed this loss to several major causes, including severe winter weather, increasing interest charges, and start-up costs in "Skytop," a segment of TI's Energy Equipment Manufacturing Division. (PX 19 at 4).

On that same day, TI reported its first quarter loss to the SEC by filing a Form

10–Q and issued a press release in which the loss figures were reported and compared with the 1978 first quarter results. (PX 20). When the TI Supplemental Proxy Material was sent to its shareholders on May 19, it made no mention of the first quarter loss, nor did it refer to the Form 10–Q or the May 15 press release.

TI's 1978 Annual Report had been mailed to the shareholders along with TI's initial proxy solicitation on May 7–8. The Annual Report contained a "President's Letter to Shareholders" in which Mr. Platt gave an overview of the Company's recent activities and prospects for the future. In that letter, Platt described the Company's Energy Equipment Manufacturing Division, briefly detailed its performance, and concluded by stating, "All told, I would expect 1979 to be a slightly profitable year for the Division, but the outlook for 1980 and future years is extremely bright. . . ." (PX 8 at 2).

Plaintiffs contend that TI's failure to include the first quarter loss in its Supplemental Proxy Material was an omission of a material fact that denied to the shareholders the "total mix" of information necessary to evaluate management. They argue that the omission was especially significant here, where shareholders were being asked to choose between slates of candidates respectively advocating and opposing the continued operation of the company, and where an incumbent candidate was predicting mild profitability for the Division of TI that was one of the major causes of the earnings loss.

TI's response rests primarily on the sufficiency of its public dissemination of this information. The company asserts that its shareholders were made aware of the first quarter loss at the earliest possible time by virtue of the Form 10–Q filing and the issuance of the May 15 press release. TI acknowledges the rule established in *Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 265 (3d Cir.), *cert. denied*, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972), that a

material omission in one party's proxy materials cannot be excused by relying on a disclosure of the information by the opposing party. Nevertheless, TI points to a discussion of the first quarter loss in plaintiffs' May 25, 1979 letter to the shareholders as evidence of the public availability of the earnings data.[9] (TI Ex. 33). This public dissemination is said to have brought the first quarter loss within the "total mix" of information presented to the shareholders. *See TSC Industries, supra.* Alternatively, TI urges that even if the first quarter loss was not properly disclosed, it was only "tangentially related to the question before the shareholders," and therefore not a material omission. *See Cohen v. Ayers*, 449 F.Supp. 298, 315 (N.D.Ill.1978), *aff'd*, 596 F.2d 733 (7th Cir. 1979).

### A. DISCLOSURE

An inquiry into the sufficiency of disclosure in a proxy contest is not limited to those documents specifically labelled as proxy statements. For example, a corporation's proxy statement need not duplicate financial information furnished simultaneously to shareholders in the corporation's annual report. *Ash v. LFE Corp.*, 525 F.2d 215, 219 (3d Cir. 1975); *Cohen v. Ayers, supra*, 449 F.Supp. at 317. In addition, the "total mix" of information available to the shareholders can be established by reference to other publicly disseminated information of which the shareholders are presumably aware. *See Valente v. PepsiCo., Inc.*, 454 F.Supp. 1228, 1242 (D.Del.1978); *Spielman v. General Host Corp.*, 402 F.Supp. 190, 195 (S.D.N.Y.1975), *aff'd per curiam*, 538 F.2d 39 (2d Cir. 1976). Of paramount importance in each of these cases, however, was the direct availability to each shareholder of the information in question.

In *Valente*, the allegedly non-disclosed information concerned the extent of an acquiring corporation's existing control over a

---

**9.** If intended to do so, this document does not support the conclusion that the shareholders' awareness of the first quarter loss follows from plaintiffs' awareness of it. As active participants in a proxy contest, plaintiffs were much more likely to keep abreast of developments at TI than the average shareholder.

target corporation. Presumably, this would have been known by any shareholder of the target who had received that corporation's prior annual reports. The court refused to grant summary judgment in favor of the defendants despite these earlier "disclosures" because many details of control were not contained in the annual reports, and because those facts which were disclosed were not always prominently displayed. 454 F.Supp. at 1242 & nn.20–21. It was left to the trier of fact to determine whether the prior disclosure effectively informed the shareholders about control at the time that issue became relevant.

In *Spielman*, plaintiff challenged the non-disclosure by the defendant tender offeror of the difficulty it would have in securing effective operating control of the target company. The principal impediments to control were the staggered terms of the target's Board of Directors and the cumulative voting method by which they were elected. The District Court considered these facts to be well known to the shareholders of the target company, and therefore within the "total mix" of information conveyed or available to them. 402 F.Supp. at 201. In affirming the decision, the Second Circuit Court of Appeals was persuaded less by the communications the shareholders received than by the very nature of the information itself.

> But this, we make clear, is not a case where the "total mix" of communications alone is relied upon to justify a misleading proxy statement. Generally, the "total mix" would be insufficient to compensate for omissions in the prospectus since an investor is all too apt to look upon those communications as self-serving and to consider the prospectus as a more objective, self-contained statement upon which he may justifiably rely to make an informed investment decision. The "mix" in this instance, however, pertains to a subject—the target company's own

staggered board and cumulative voting— of which its own stockholders were *presumably aware*, if they were aware of anything.

538 F.2d at 40–41 (emphasis in original).[10]

TI cited no case in which news accounts of material facts were found to be an adequate substitute for disclosure in the proxy solicitations, nor was the Court able to find conclusive authority for this proposition. In *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579 (5th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974), dealing with disclosures in the course of a tender offer, the court stated, "Facts may be adequately disclosed by emphasis or repetition in previous correspondence by the same parties or through outside sources." 489 F.2d at 606. The Court then cited *Johnson v. Wiggs*, 443 F.2d 803, 806 (5th Cir. 1971), in which information contained in newspaper and television reports and available from brokerage houses was held to be in the "public domain," obviating the need for specific disclosure. However, *Johnson* involved alleged violations of Rule 10b–5 and an unsolicited offer to sell. The issue of disclosure concerned whether the buyer had withheld "inside information" that had been publicly disseminated. Further, application of the holding in *Johnson* and the *dicta* in *Smallwood* to the issue of non-disclosure in a proxy contest would be inconsistent with the rule of *Kohn v. American Metal Climax, Inc., supra*, prohibiting reliance on an opposing party's proxy materials to excuse non-disclosure.

Unlike the "total mix" cases relied upon by TI, the press release and Form 10–Q containing the first quarter results were not mailed directly to each TI shareholder, nor was this the type of information of which those shareholders were "presumably aware." Rather, this was recent news, unknown even to TI management before May 15, disseminated in a fashion by TI that by

---

10. Both the District Court and the Court of Appeals noted that the information at issue was disclosed in the proxy materials of the party claiming insufficient disclosure by its opponent. Neither court, however, seems to have relied on that disclosure in reaching the conclusion that the shareholders were presumably aware of the relevant facts. 402 F.Supp. at 201; 538 F.2d at 40.

no means gave fair notice to each shareholder. Accordingly, it is held TI failed to disclose the fact of the first quarter loss in this proxy contest.

## B. MATERIALITY

In light of the determination that the first quarter losses were not properly disclosed, it next must be determined whether that omission was material, *i. e.*, whether there was a substantial likelihood that a reasonable TI shareholder would consider it important in deciding how to vote. *TSC Industries, Inc. v. Northway, Inc., supra.*

The May, 1979 proxy contest centered around the election of three members of a ten-person Board of Directors. As in any case involving election of directors, shareholders are entitled to receive information bearing on the competence of those exercising stewardship over the corporation. *See Cohen v. Ayers, supra,* 449 F.Supp. at 317. In evaluating the performance of incumbent directors, profits realized or losses sustained by a corporation are universally accorded a high priority. Stated simply, the reasonable shareholder wants to know whether his or her investment is making money and whether his equity is growing or diminishing.

In the instant case, the debate between the competing slates focussed primarily on one issue—whether TI should remain in business as an ongoing concern, or whether the Company should be sold or liquidated at the earliest possible time. Each side adopted a clearly identifiable position on the issue, and each was required to disclose all facts that were likely to influence a shareholder's choice between the two.

In *Kass v. Arden-Mayfair, Inc., supra,* plaintiffs were opposing five incumbent nominees for seats on the Arden-Mayfair Board of Directors. The central theme of plaintiffs' proxy solicitation was "the incumbents' allegedly dismal record in operat-

ing the Company." Neither side was advocating the sale or liquidation of the Company. Plaintiffs challenged the failure of the incumbent nominees to disclose losses of over $1,400,000 during January and February of 1976 in their April 12, 1976 proxy solicitation.[11] While the court denied plaintiffs' request for preliminary injunctive relief for reasons not relevant here, 431 F.Supp. at 1040–42, it made clear the seriousness of defendants' failure to disclose the financial losses. Noting that Arden-Mayfair's unreported losses had increased by over 100% when compared with the same period of the previous year, the court concluded:

> At trial the defendants will have to carry a heavy burden to satisfy the court that the unreported losses, if divulged to the shareholders, would not have had a significant likelihood of being important in their voting decision.

431 F.Supp. at 1043.

In the instant matter, TI's losses for the first quarter of 1979 represented an increase of more than 1100% when compared to the 1978 first quarter results. Shareholders who were being asked to follow management's recommendation of maintaining TI as an ongoing concern had a right to be informed of these first quarter losses. Even accepting TI's contention that the first quarter loss did not refute management's statement that its goal was to maximize long-term earnings, or its opinion that sale or liquidation of the company at that time was not in the shareholders' best interests, the existence of the loss would be likely to cause a reasonable shareholder to question more closely the wisdom of that opinion and the probability of existing management's achieving their goal. Accordingly, TI's failure to disclose the losses sustained during the first quarter of 1979 in its May 19 Supplemental Proxy Materials constituted an omission of a material fact in violation of § 14(a) of the Act and Rule

11. Arden-Mayfair had never issued financial statements for a lesser period than a full quarter. According to plaintiffs, however, the usual May or June annual meeting date had been advanced to April, and first quarter results

were not yet available. The court's discussion related to unaudited figures for an eight-week period in January and February. 431 F.Supp. at 1042–43.

14a–9 promulgated thereunder, 17 C.F.R. § 240.14a–9.

## IV. THE ALLEGED FAILURE BY TI TO DISCLOSE THE FEBRUARY 27, 1979 AMENDMENT TO THE 1974 STOCK OPTION PLAN

The TI Non-Qualified Stock Option Plan ("Option Plan"), adopted in 1974, authorized the granting of options to key employees to purchase in the aggregate up to 500,000 shares of TI stock. It included as beneficiaries more than 30 directors, officers and non-officer employees of the Company. (Tr. 396). The 1974 Option Plan provided that no options granted under it could be exercised until five years after the date of the grant, at which time ten percent of the option became exercisable. The remaining options could be exercised in annual increments ranging from ten to twenty percent, with all options exercisable in the twelfth year. (PX 8 at f 19).

As of December 31, 1978, there were options on 314,750 shares outstanding, with option prices ranging approximately from $6 to $10 per share. Under the terms of the 1974 Option Plan, none of these 314,750 options were exercisable as of June 30, 1979. (PX 8 at f 19; PX 26 at T–24). Those holding stock options at the time of the proxy contest included two of the incumbent nominees for the Board of Directors, Delwin C. Stults and Earl E. De-Frates, as well as Directors Walter D. Bankston, Cloyce A. Talbott, and Robert C. Gist. George Platt, the third incumbent nominee, held no stock options. (PX 6 at 11; PX 60 at 43).

The 1974 Option Plan was amended by the TI Board at its February 27, 1979 meeting. As a result of the amendment, the gradual exercisability of the options outlined above remained in effect in most cases. However, immediate and total vesting of all options granted was authorized upon the occurrence of any of several "total vesting events" after January 1, 1979. These events included the acquisition by ten or fewer persons of more than 20% of TI's common stock, the sale or disposition of more than 75% of TI's assets, the adoption of a plan of complete or partial liquidation, the repurchase or redemption by TI of more than 50% of its own voting stock within a 24-month period, or a change in the makeup of the TI Board of Directors whereby a majority of the Board as constituted on January 1, 1979 ceases to represent a majority of some newly constituted Board at any point within the next five years. (PX 5 at 17–18). Without question, this amendment conferred a benefit on those who would attempt to exercise options under the Plan, for the occurrence of one of these events would increase dramatically the number of each holder's options eligible to be exercised.

The parties disagree as to whether any of the directors holding options were recipients of this benefit, and further, as to management's motivation in adopting the amendment. Plaintiffs contend that the change in the Option Plan was designed to promote the financial well-being of the directors, and that such evidence of self-interest should have been disclosed to TI's shareholders. TI asserts that the purpose of the amendment was to benefit *other* TI employees, that the amendment conferred no benefit on the directors, and that it was immaterial to the contest for election of directors.

In order to understand TI's position, it is necessary to understand another aspect of TI's program for management compensation. In September, 1978, Directors Bankston, DeFrates, Gist, Platt and Stults entered into Agreements for Performance Compensation, pursuant to which they received in the aggregate 500,000 stock appreciation rights ("SAR's"). Recipients of these SAR's are entitled to cash payments in an amount equal to the appreciation of TI stock from $8⅞ per share, the price of the stock when the SAR's were granted, to the computed price of TI stock when the SAR's are exercised. These SAR's vest at the rate of ten percent per year for all recipients except Mr. Platt, whose SAR's vest at the rate of twenty percent per year. All SAR's will vest in full, however, upon the occurrence of "total vesting events"

that are quite similar to those incorporated into the February 27, 1979 amendment to the Stock Option Plan. (PX 6 at 8–9; PX 23).

At the same February 27 Board of Directors meeting, the TI Board determined that a Stock Appreciation Rights Plan ("SAR Plan"), modifying to some extent the September, 1978 Agreements, should be submitted to a vote of TI shareholders at the 1979 Annual Meeting. If the SAR Plan received shareholder approval, the earlier Agreements would come under the terms of such Plan and be modified accordingly. (PX 5 at 16; PX 6 at 9). If shareholder approval was not obtained, the Agreements were to remain in effect. The principal reason for requesting shareholder approval of the SAR Plan was to insulate any payments under the Agreements from the "short swing profit liability" provisions of § 16(b) of the Act, 15 U.S.C. § 78p(b). (PX 5 at 16; PX 25).[12]

Finally, at the March 22, 1979 Board of Directors meeting, the TI Board adopted a resolution whereby holders of both Stock Options and Stock Appreciation Rights, upon exercising their stock appreciation rights, will relinquish a pro rata portion of their stock options. (PX 27 at 8). In explaining the effect of this resolution [13] to its shareholders, TI stated:

> It is also anticipated that the [SAR] Committee and each of such individuals [Messrs. Bankston, DeFrates, Gist, Platt and Stults] may agree to the inclusion of a provision in the individual Agreements that would require the forfeiture of certain non-qualified options to acquire common stock that the individual presently has (some of which were granted pursuant to the Company's 1974 Non-Qualified Stock Option Plan), and, alternatively, the forfeiture of certain [Stock Appreciation] Rights upon exercise of such op-

tions. *However, there is no assurance that such provisions will be agreed to by the Committee and such individuals.*

(PX 6 at 15) (emphasis added).

TI contends, and plaintiffs do not dispute, that the SAR's provide more favorable tax ramifications to the recipient than do stock options granted under the Option Plan.[14] (Tr. 393). Therefore, TI argues, since directors must exercise either their stock options or their SAR's, rather than both, they will certainly elect the SAR's. As a result, defendant asserts, the amendment to the Option Plan conferred no benefit on the directors, but was implemented merely to make the vesting provisions of the two Plans compatible. The Court finds, however, that the record evidence indicates otherwise.

The amendment to the Option Plan was proposed and ratified at the same time that the TI Board became aware of potential short swing liability problems with respect to the SAR's. When the March 22 resolution (calling for pro rata relinquishment of rights under one Plan when the other Plan is exercised) was adopted, Director Platt discussed the relationship between the two Plans. According to the Minutes of the March 22, 1979 Board of Directors meeting:

> Mr. Platt stated that if the stockholders do not approve the SAR Plan and the SAR Plan [is] not honored, then the holders of both the non-qualified stock options and stock appreciation rights *should be allowed to benefit from their options,* but if the SAR Plan is approved or any litigation arising out of the SAR Plan is decided in favor of the holders of the stock appreciation rights, then the option holders who have stock appreciation rights should return to the Company any profit realized from the options exercised.

12. Plaintiffs separately challenge the alleged failure by TI to disclose this purpose for requesting shareholder approval of the SAR Plan. See Part V, *infra.*

13. The Court makes no finding as to the binding effect of this resolution on members of the TI Board of Directors. In light of the disclaim-

er contained in the proxy statement (PX 6 at 15), TI apparently is of the view that the resolution is not binding.

14. In addition, persons exercising SAR's need not raise substantial amounts of cash to exercise stock appreciation rights, as they must when exercising stock options.

(PX 27 at 8) (emphasis added). As is obvious from the foregoing, the TI Board contemplated a situation in which the SAR Plan would be unavailable or unattractive to holders of stock appreciation rights, and recognized the value to such persons of the stock options. Indeed, the continued importance of the Option Plan to the holders of SAR's was underscored by the rejection of the SAR Plan by the shareholders at the Annual Meeting. (TI Ex. 24).

The Court finds that TI management, at the critical time period in question, was of the view that holders exercising stock appreciation rights remained vulnerable to a challenge under § 16(b) of the Act seeking disgorgement of their profits, along with the attendant costs of litigation. The threat of such a challenge, even if the holder is confident of victory, may cast the stock options in a more appealing light despite their negative tax implications. In any event, the Court finds that the February 27, 1979 amendment conferred a benefit on those directors holding stock options under the 1974 Non-Qualified Stock Option Plan. It remains only to determine whether TI's admitted failure to disclose the amendment in its proxy materials violated § 14(a) of the Act.

The S.E.C. regulations regard information concerning management remuneration in general, and management participation in stock option plans in particular, as being important to shareholders in proxy solicitations involving the election of directors. *See* Schedule 14A, Item 7, 17 C.F.R. § 240.-14a–101.[15] While those regulations do not expressly require disclosure of the vesting provisions of stock option plans, it must be noted that Schedule 14A sets only minimum disclosure standards. Compliance with this schedule does not necessarily guarantee that a proxy statement satisfies Rule 14a–9. *Maldonado v. Flynn*, 597 F.2d 789, 796 n.9 (2d Cir. 1979); *Cohen v. Ayers, supra,* 449 F.Supp. at 317; *Lyman v. Standard Brands, Inc.,* 364 F.Supp. 794, 796 (E.D.Pa.1973). Rather, the Court must examine the materiality of the omitted information in the context of the proxy contest at issue.

In *Maldonado v. Flynn, supra,* the defendant directors advanced the exercise date of their option some 12 days in order to permit them to benefit from an impending tender offer that had not yet become public knowledge. The court found that the failure to disclose this change of exercise date and the resulting benefits to the directors who approved it established a prima facie showing that the corporation's proxy materials were false and misleading in violation of Rule 14a–9. 597 F.2d at 797–98. The facts in the instant case are less compelling, for the TI directors have not received the tangible rewards that accrued to the defendants in *Maldonado.* Nonetheless, the reasoning in *Maldonado* applies with equal force here. "Since self-dealing presents *opportunities* for abuse of a corporate position of trust, the circumstances surrounding corporate transactions in which directors have a personal interest are directly relevant to a determination of whether they are qualified to exercise stewardship of the company." 597 F.2d at 796 (emphasis added). *See also Cohen v. Ayers, supra,* 449 F.Supp. at 317.

■ The TI directors approved an amendment to the Stock Option Plan by which the value to them of their stock options would increase dramatically should a "total vesting event" occur. These "total vesting events" include transactions such as

15. Rule 14a-3, 17 C.F.R. § 240.14a–3, requires that proxy statements contain the information specified in Schedule 14A, 17 C.F.R. § 240.14a–101. Item 7 of Schedule 14A requires that if action is to be taken with regard to the election of directors, the information called for by item 4 of Regulation S–K, 17 C.F.R. § 229.20, must be furnished. That section, dealing with management remuneration, requires in subsection (d) that certain information regarding the granting of options be disclosed. Most pertinent for present purposes is Instruction 2 to subsection (d), which states, "The extension, regranting, or material amendment of options shall be deemed the granting of options within the meaning of this paragraph." Thus, the regulations adopted by the Securities and Exchange Commission recognize that a material change in an existing option plan is as important a topic for disclosure as is the creation of an option plan. *See Maldonado v. Flynn,* 597 F.2d 789, 797 n.12 (2d Cir. 1979).

the sale or liquidation plans proposed to the shareholders by plaintiffs. The Court concludes that a reasonable TI shareholder would have considered this fact important in deciding how to vote on the election of directors, and that failure to disclose the amendment to the Option Plan constituted a violation of § 14(a) of the Act and Rule 14a–9 promulgated thereunder.

## V. THE ALLEGED FAILURE BY TI TO DISCLOSE THE PURPOSE BEHIND SUBMITTING THE SAR PLAN FOR SHAREHOLDER APPROVAL

As stated in Part IV, *supra*, the TI Board determined that the Stock Appreciation Rights Plan of 1979 was to be submitted to the shareholders for approval at the 1979 Annual Meeting. If approved, this Plan would incorporate, with certain modifications, the September, 1978 Agreements that awarded 500,000 stock appreciation rights among five TI directors.

In a February 23, 1979 memorandum to the Board of Directors, Gist explained why shareholder approval of the Plan was necessary:

A recent decision in a federal court case indicates that profits received by insiders as a result of exercising SAR's are payable to the company under the provisions of Section 16(b) of the Securities Act of [1934], as amended. Basically, Section 16(b) prohibits insiders from keeping short swing (6 months) profits received in transactions dealing with a company's stock.

The provisions of Section 16(b) do, however, have a "safe harbor" whereby insiders may keep the profits received upon the exercise of SAR's.[16] Specifically, SAR's which are granted pursuant to a written plan containing the elements set forth below will be exempt from Section 16(b) ramifications. In order for the Company to award SAR's which will be of a benefit to its recipients (i. e. not subject to Section 16(b)), a written plan must be adopted which meets the following conditions:

1. *Stockholder Approval*

The plan must have been approved by the affirmative vote of a majority of the Company's shareholders.

\* \* \* \* \* \*

(PX 25 at 1). Gist's recommendation was followed by the Board of Directors (PX 5 at 16). In describing the SAR Plan to the shareholders, the TI proxy materials do not disclose this "safe harbor" purpose for seeking shareholder approval.

The TI proxy materials did inform the shareholders about the September, 1978 Agreements, describing in sufficient detail the value of the stock appreciation rights to each recipient and the vesting provisions contained therein. (PX 6 at 8–9, 10–11, 15). TI also described the SAR Plan on which the shareholders were to vote, attaching a copy of the plan as an exhibit to its proxy statement. (PX 6 at 13–15, I–1—I–5). That description stated that if the SAR Plan were approved, the rights granted to the five directors in September, 1978 would be considered Rights granted under the SAR Plan. (PX 6 at 15). Plaintiffs did not contest and accordingly there is not in issue the fact that the shareholders also could determine from the proxy statement that if the SAR Plan were defeated, the September, 1978 Agreements with the five directors would remain in effect.

Plaintiffs challenge the failure to disclose the Section 16(b) ramifications of shareholder approval on three separate grounds. They contend first that the "safe harbor" purpose would have been important to a reasonable TI shareholder in deciding how to vote on the election of directors. Next, they allege that the rights granted in September, 1978 were designed, at least in part, to compensate management unlawfully for past services, and that under the Delaware State corporate case law, shareholder ratifi-

---

**16.** This so-called "safe harbor" provision is found in Rule 16(b)-3 promulgated by the S.E.C., 17 C.F.R. § 240.166 3.

cation would shift the burden of proving the inadequacy of the consideration received by TI under the Agreements from the employee-directors to a derivative plaintiff. Finally, they allege that the need for shareholder approval of the SAR Plan provided the motive for management's refusal to accept the Gold Crown offer prior to the Annual Meeting.

■ The last two of these claims for relief are easily dismissed. TI denies that the stock appreciation rights granted in September, 1978 unlawfully compensate management for past services. Whatever the reasons for awarding these stock appreciation rights, the Court finds that TI's purpose was not to compensate management for past services. Liability under Rule 14a–9 is predicated upon a showing that an allegedly omitted fact is true. *See Shapiro v. Belmont Industries, Inc.*, 438 F.Supp. 284, 290 (E.D.Pa.1977). While it is therefore unnecessary to consider the shifting burden of proof argument, the Court notes that the federal proxy rules do not require disclosure of a disputed legal theory regarding the legality of transactions approved by the Board of Directors, *Ash v. LFE Corp.*, 525 F.2d 215, 220 (3d Cir. 1975), nor do they require disclosure of one's opponent's characterization of the facts. *See Golub v. PPD Corp.*, 576 F.2d 759, 765 (8th Cir. 1978). As to the argument concerning management's motive for rejecting the Gold Crown offer, there is simply no evidence in the record supporting plaintiffs' allegation.

The first contention made by plaintiffs is a much closer question. In understanding its resolution, it is helpful to delineate an issue not presented for decision. A persuasive argument could be made that the "safe harbor" purpose for seeking shareholder approval would be an important fact to a shareholder in deciding how to vote *on the SAR Plan itself*. The TI proxy statement indicates that certain employee-directors stood to benefit substantially if the SAR Plan were approved. It also indicates that those same employee-directors would receive virtually identical compensation under their September, 1978 Agreements if

the SAR Plan were rejected. A TI shareholder might have been uncertain as to the reason his vote was being solicited, and reasonably might have concluded that his vote on the SAR Plan would not affect whether the employee-directors would receive the benefits of their stock appreciation rights. Had that shareholder been informed of the Section 16(b) implications, and the possibility that profits obtained under the Agreements could be recovered from the recipients, the impact of a "No" vote on the SAR Plan would have appeared to be more tangible. Whether this fact would have "significantly altered the 'total mix' of information made available" need not be decided, however, because the SAR Plan was defeated by the shareholders at the Annual Meeting. (TI Ex. 24 at 2). The issue before the Court is whether the omitted information was material solely in the context of the election of directors.

TI shareholders were entitled to know "the circumstances surrounding corporate transactions in which directors have a personal interest," since such information is "directly relevant to a determination of whether [the directors] are qualified to exercise stewardship of the company." *Maldonado v. Flynn, supra*, 597 F.2d at 796. *See also Cohen v. Ayers, supra*, 449 F.Supp. at 317. In this case, the shareholders were told the degree to which each director was interested in the SAR Plan and the earlier Agreements. They were told what would be the value to the directors, and the concomitant expense to the Company, when the stock appreciation rights were exercised, as well as the circumstances under which the rights would vest. Finally, they were told that the SAR Plan had been approved by the TI Board of Directors, and that the Board recommended shareholder approval of the Plan. In short, if a TI shareholder believed that participation in the development of one's own compensation package reflected poorly on that person's qualifications as a director, or that the package was overly generous, the disclosures actually made in the TI proxy statement sufficiently alerted the shareholder

that such conduct had taken place here.[17] The critical inquiry, then, is whether the omitted information about the potential for short swing liability would have assumed further significance in a shareholder's evaluation of the TI nominees.

TI argues that a reasonable shareholder would assume that the recipients of SAR's would be entitled to receive the benefits afforded by the Plan if the Plan were approved. The question of management's motive in seeking shareholder approval, it is asserted, is not relevant to the election of directors, since the shareholders were told the directors would benefit if the plan were approved.

■ Generally, management need not disclose its motives in proposing action for shareholder approval, so long as the relevant facts concerning that action are set forth. This is especially so when the undisclosed motivation is an obvious one, such as management's desire to perpetuate itself in office. See Elgin National Industries, Inc. v. Chemetron Corp., 299 F.Supp. 367, 372–73 (D.Del.1969); Jewelcor, Inc. v. Pearlman, supra, 397 F.Supp. at 248–49. In the instant case, the omitted information is something more than management's motivation. If the Board's fears about short swing profit liability are justified, then TI's shareholders had the ability to frustrate the Board's intention of awarding to five individuals stock appreciation rights with a potential value of several million dollars, and to keep that money within the corporate treasury for the shareholders' benefit. It was this "veto power" residing in the shareholders that was not disclosed in the TI proxy statement.

In concluding that the omitted information nevertheless was not material to the election of directors, a distinction must be drawn between the relevance to the shareholders of the potential Section 16(b) liability and the relevance to them of the fact that TI withheld this information. Arguably, the latter is a significant indication of the TI nominees' fitness to exercise stewardship over the Company, as it reflects on their candor in dealing with the shareholders whose votes they sought. Section 14(a) of the Act and Rule 14a–9, however, do not require what amounts to a confession that certain information, otherwise immaterial to the issue before the shareholders, has been omitted.

These provisions may not be used "as an avenue for access to the federal courts in order to redress alleged mismanagement or breach of fiduciary duty on the part of corporate executives." Maldonado v. Flynn, supra, at 796. Allegations of proxy violations have been rejected, for example, where the claims arose out of a failure to disclose illegal foreign payments made by the corporation. See Levy v. Johnson, [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,899 (S.D.N.Y.1977). While those payments were not material to the issue before the shareholders, management's failure to disclose the payments once again might be viewed as implicating management's candor. Such a broad view of materiality in the context of election of directors would render meaningless the requirement that the misrepresented or omitted fact relate to the purpose for which proxies were solicited. See, e. g., Halle & Stieglitz, Filor, Bullard, Inc. v. Empress International, Ltd., 442 F.Supp. 217, 223 (D.Del.1977).

In an analogous context, the Third Circuit Court of Appeals has stated:

> The securities laws, while their central insistence is upon disclosure, were never intended to attempt any such measures of psychoanalysis or reported self-analysis. The unclean heart of a director is not actionable, whether or not it is "disclosed," unless the impurities are translated into actionable deeds or omissions both objective and external.

---

**17.** The Court does not suggest that receipt of stock appreciation rights did in fact impugn the qualifications or integrity of the incumbent TI directors, or that the stock appreciation rights benefits were overly generous. Provided the facts surrounding management's compensation were accurately disclosed, an assessment of the fairness of that compensation is left to the shareholders rather than to the Court.

*Biesenbach v. Guenther*, 588 F.2d 400, 402 (3d Cir. 1978) quoting from *Stedman v. Storer*, 308 F.Supp. 881, 887 (S.D.N.Y.1969). This reasoning is equally applicable where a proxy violation is alleged, for to hold otherwise would expand the concept of materiality to unworkable proportions.

■ Turning to the significance of the Section 16(b) ramifications of shareholder approval, there is not a substantial likelihood that a reasonable TI shareholder would consider it important in deciding how to vote on the election of directors. In reading the TI proxy statement, a shareholder would conclude that management wanted the recipients of stock appreciation rights under the Agreements or under the SAR Plan to enjoy the financial benefits of those rights. Any inference a shareholder chose to draw concerning a preoccupation by the management nominees with their own financial well being could be drawn from the information provided. That inference, however, or others like it concerning the honesty, loyalty or competence of the TI nominees, is not advanced further by disclosure of the potential for short swing liability. A shareholder who had been informed of the "safe harbor" purpose would have no reason to think differently about the TI nominee's fitness for office. Accordingly, I conclude the omitted information was not material, and failure to disclose it was not a violation of § 14(a) of the Act or Rule 14a–9.

## VI. THE ALLEGED FAILURE BY TI TO DISCLOSE THE PATTERSON DRILLING TRANSACTION

On or about December 12, 1978, Texas International Petroleum Corporation ("TIP-CO"), a wholly owned subsidiary of TI, entered in to a contract with Patterson Drilling Company ("Patterson") whereby Patterson agreed to drill several wells for TIP-CO. (PX 71). Six wells were drilled by Patterson between January and May of 1979, for which it was paid $340,594.88 by TIPCO. (PX 79; Felter Dep. at 107–09). Cloyce A. Talbott ("Talbott"), a director of TI, is also a director, officer and 50% shareholder of Patterson. (PX 58 at 37–39). Plaintiffs contend that the failure by TI to disclose this transaction in its proxy materials constituted a *per se* violation of Rule 14a–3, 17 C.F.R. § 240.14a–3.[18]

TI responds that the Patterson transaction was not material to the election of directors,[19] that it was the product of competitive bidding and therefore exempt from the disclosure requirements of Rule 14a–3 and Schedule 14A, and that its conduct is not sufficiently culpable to establish liability under § 14(a) of the Act. In support of this last argument, TI points to questionnaires sent to each TI director in March, 1979 seeking information as to financial transactions between the director and the Company. Talbott's completed questionnaire, dated March 14, 1979, made no mention of the Patterson contract, even though Section 5 of the questionnaire clearly encompassed such a transaction. (TI Ex. 48). As a result, TI's officers and other directors were unaware of Talbott's interest in Patterson. (Tr. 399; Platt Dep. (II) at 170).

■ The degree of culpability necessary to establish liability under § 14(a) of the Act has not yet been defined by the Su-

---

18. Item 6(b) of Schedule 14A requires that, if action is to be taken with respect to the election of directors, management must disclose, with respect to each person nominated for election as director and each person whose term of office will continue after the meeting:

 (3) If the nominee or director is, or has within the last two full fiscal years been, an officer, director or employee of, or owns, or has within the last two full fiscal years owned, directly or indirectly, in excess of 1 percent equity interest in any firm, corporation or other business or professional entity:

\* \* \* \* \* \*

 (iv) To which the issuer or its subsidiaries has made payments for property or services during such entity's last fiscal year in excess of 1 percent of such entity's consolidated gross revenues for its last full fiscal year. The transaction with TIPCO accounted for more than 1 percent of Patterson Drilling's gross revenues. (Tr. 365–66).

19. According to Talbott, Patterson Drilling Co. agreed to do the work at too low a price and sustained a loss in the transaction. (PX 58 at 41).

preme Court. *See TSC Industries, Inc. v. Northway, Inc., supra,* 426 U.S. at 444 n. 7, 96 S.Ct. at 2130 n. 7. The lower courts are agreed, however, that rather than imposing absolute liability on a corporation for a false or misleading proxy statement, the appropriate standard to be applied is one of negligence. *See Gould v. American-Hawaiian Steamship Co.,* 535 F.2d 761, 777–78 (3d Cir. 1976); *National Home Products, Inc. v. Gray,* 416 F.Supp. 1293, 1313 (D.Del.1976) (proxy solicitor knew or should have known that omission of material information made proxy documents false or misleading).

■ In the instant case, the transaction with Patterson appears to have been a routine, relatively minor matter that would not have come to the attention of top management in the ordinary course of affairs. Since Talbott failed to volunteer the information in his March 14 questionnaire, TI management would not have known about Talbott's association with Patterson when the proxy materials were mailed. If liability is imposed on TI under these circumstances, future proxy solicitors will have to examine each business transaction consummated during the previous year for evidence of director involvement. Such a monumentally onerous burden could not have been the intent of Congress in enacting § 14(a) of the Act, or of the S.E.C. when it adopted Rule 14a–3 and Schedule 14A. Inasmuch as TI was not negligent in failing to disclose the Patterson transaction, there can be no finding of liability on its party.[20]

## VII. THE ALLEGED MISREPRESENTATION AS TO THE CONSIDERATION FOR THE TALBOTT BONUS

■ Pursuant to an agreement dated December 21, 1978, TI paid a bonus of $250,000 to Cloyce A. Talbott, a director of TI, and also the head of TI's Well Servicing Division until it was sold to NL Industries, Inc. in 1978. (PX 30). In disclosing this

bonus to its shareholders in its proxy materials, TI stated:

> In recognition of the many years of service Mr. Talbott gave to the Company, and specifically for the valuable contribution he made toward the appreciation in value in the Company's Energy Services Division, *and as consideration for not going into competition with the Company or NL Industries, Inc. in the well servicing business,* the Company paid Mr. Talbott a bonus of $250,000 in January, 1979, and awarded him a ten-year irrevocable option to purchase 50,000 shares of the Company's common stock at the then current market value price, $8.00 per share.

(PX 6 at 11) (emphasis added).

Plaintiffs contend that this statement was a misrepresentation in that the agreement not to compete was not consideration for the bonus, but was instead an afterthought included to make the bonus appear more reasonable. Plaintiffs point to Talbott's deposition testimony that the existence and size of the bonus had been determined before the non-competition agreement ever was mentioned. (PX 58 at 26). Be that as it may, the actual written agreement between TI and Talbott provides in pertinent part:

> In recognition of your valued past services, for your services in helping us negotiate and close the NL sale, and in consideration for the below written non-competition agreement, the Company will pay you the sum of $250,000. . . .
>
> * * * * * *
>
> In consideration for the foregoing payments, you agree that for a period of three (3) years after the closing date of the sale of the Division to NL Industries, Inc., you will not compete directly or indirectly with Texas International Company or NL Industries, Inc. . . . in the conduct of the operation in which the Division is now engaged. . . .

---

**20.** Having found an absence of negligence, it is unnecessary to reach TI's other defenses. The Court notes, however, that in light of the fairness of this transaction to TI, it was not material information under Rule 14a-9, nor have

plaintiffs made the requisite showing of causation that would entitle them to relief under Rule 14a-3. *See Dillon v. Berg,* 326 F.Supp. 1214, 1234-35 n. 31 (D.Del.), *aff'd per curiam,* 453 F.2d 876 (3d Cir. 1971).

Regardless of the course of negotiation over this issue, the face of the contract clearly demonstrates that the covenant not to compete was consideration for the bonus, and Talbott appears to be bound by his promise. Accordingly, plaintiffs have failed to prove that the statement in TI's proxy materials concerning the consideration for the bonus is false or misleading.

## VIII. THE ALLEGED MISREPRESENTATION AS TO THE IMPORTANCE OF REELECTING THE INCUMBENT DIRECTORS

In urging the reelection of Platt, DeFrates and Stults, TI stated in its Supplemental Proxy Material:

We believe it is imperative that these three senior executives of your Company remain on the Board of Directors. We believe that these senior executives of your Company, serving on the Board of Directors, can do more for the stockholders than Ling and Bertoglio.

(PX 17 at 6). All three incumbents were reelected at the May 31, 1979 Annual Meeting. (TI Ex. 24). Because of matters that arose in July and August of 1979, Platt asked for DeFrates' resignation on August 20, 1979. (PX 73 at 77–80). DeFrates did resign, and is no longer an officer or director of TI. (PX 49; PX 69). Stults resigned as Executive Vice President of TI during the last week of August, 1979, but agreed later to serve the remainder of his term as a director. (PX 59 at 32–34; Stults Dep. at 54). There is no evidence that either man's departure from TI in August, 1979 was planned or contemplated by anyone at the time of the proxy solicitation and Annual Meeting.

■ Plaintiffs claim the events of August, 1979 confirm that it was not "imperative" that DeFrates and Stults remain on the Board of Directors, thereby rendering the TI proxy statement false and misleading. However, absent proof that the statement was false *when made*, plaintiffs' claim must fail. *See Kaunder v. United Board & Carton Corp.*, 199 F.Supp. 420, 422 (S.D.N.Y.1961).

## IX. THE ALLEGED MISREPRESENTATIONS IN THE MAY 14 WALL STREET JOURNAL ARTICLE

■ The Wall Street Journal on May 14, 1979 reported the plaintiffs' decisions to run for seats on the TI Board of Directors. That article attributed to an unidentified TI spokesman the statement that plaintiff Ling was not "ever able to provide even the slightest proof of his financial ability to make an offer." It further attributes to TI Chairman Platt the statement that "[N]o financial institution was committed to financing any" part of the Gold Crown proposal. (PX 15). Plaintiffs contend these statements constituted proxy solicitation material and were materially false and misleading in suggesting that the Gold Crown offer was without financial substance.

TI responds that plaintiffs have failed to prove that the statements in the article were made by Platt or any other director, officer or agent of the Company. Even assuming the statements were made by the Company, TI relies on the asserted truth of the statements to escape liability.

The Gold Crown offer did not stand on firm financial footing. Plaintiffs furnished TI with letters from Hambro America, Inc. ("Hambro") and Bear, Stearns discussing the possibility of financing the Gold Crown offer. (PX 16, Exs. A–2, A–3). Both letters specifically declined to give contractual assurances that financing would be forthcoming. Plaintiffs argue that TI knew such commitments would be withheld until confidential information on TI was given to Hambro and Bear, Stearns. Regardless of the merits of this contention, both letters raised other contingencies that cast doubt on their firmness.

The Hambro letter, in commenting that the proposed financing was "entirely feasible," relied first on TI management's support of the Gold Crown offer, and secondly on the sufficiency of TI's assets to support the financing. (PX 16, Ex. A–2; Tr. 622–23). The Bear, Stearns letter conditioned its view of the feasibility of the financing on the delivery of TI's Phoenix Resources

stock "free of any substantial liens and encumbrances," and further, on the sufficiency of that stock to support $60–$65 million in long-term debt financing. (PX 16, Ex. A–3). Gist's unrebutted testimony was that management did not support the Gold Crown offer and did not plan to cooperate with Gold Crown, that the Phoenix Resources shares were fully pledged to secure the funds used by TI to acquire them, and that those shares had a maximum loan value of only $30 million. (Tr. 280–81, 284, 287, 305–06).

In light of these conditions, TI management reasonably concluded that plaintiffs had failed to demonstrate the financial capability necessary to consummate the Gold Crown offer. Accordingly, the statements in the May 14 Wall Street Journal article were not false or misleading. If TI made the statements, it did not violated § 14(a) of the Act or Rule 14a–9. If TI did not make the statements, under the facts of this case it was under no duty to correct, rebut or otherwise explain them, because the statements were not false or misleading.

Plaintiffs also contend that TI has violated Rule 14a–6, 17 C.F.R. § 240.14a–6, which provides in pertinent part:

> (g) . . . [C]opies of soliciting material in the form of speeches, press releases and radio or television scripts may, but need not, be filed with the [Securities & Exchange] Commission prior to use or publication. Definitive copies, however, shall be filed with or mailed for filing to the Commission as required by paragraph (c) of this section not later than the date such material is used or published. . .

TI never filed copies of the quoted statements with the S.E.C.

The May 14 article does not reference a TI press release. (PX 15). The record in this case is devoid of evidence that such a press release or similar communication was issued, and TI does not admit the authenticity of the quoted statements. In short, plaintiffs have failed to prove the existence or issuance of a communication falling within the ambit of Rule 14a–6, and the claim thereunder cannot succeed.

## X. THE ALLEGED FAILURE BY TI TO DISCLOSE THE EXISTENCE OF A PROXY CONTEST IN ITS INITIAL MAILING

■ On Monday, May 7, 1979, James S. Ramsey, Jr., counsel for plaintiffs, told Daniel S. Greenfeld, counsel for TI, that on the following day plaintiffs would file proxy materials with the S.E.C. opposing certain incumbent directors. This telephone conversation took place at approximately 10:10 a.m. Dallas time. (PX 21; PX 83). The initial TI proxy solicitation was mailed to the shareholders late that same afternoon and on the following day. (AF 28). That solicitation did not state that management's nominees for directors would be opposed by the plaintiffs. (PX 6). Plaintiffs contend that failure to disclose the existence of a proxy contest in this initial mailing by TI was an omission of a material fact in violation of Rule 14a–9.

Plaintiffs themselves informed the shareholders of their candidacies in a letter dated May 11, 1979 and mailed May 14, 1979. (AF 14; PX 14; PX 16). TI's Supplemental Proxy Materials, which did disclose the opposition by plaintiffs, were dated and mailed May 19, 1979. (AF 12; AF 26; PX 17).

There is a substantial amount of evidence supporting the inference that TI management learned of the plaintiffs' intentions on May 7 and could have taken steps to alter their initial proxy solicitation before it was mailed. Assuming this to be the case, the Court nevertheless concludes that TI was not required to do so. As of May 7, plaintiffs had done nothing to formalize their candidacies. Plaintiffs' Schedules 14B were filed with the S.E.C. on the following day. (PX 9; PX 10; PX 11). Communication by plaintiffs to the shareholders was not begun until a week later. (PX 14). Telephonic advice or a threat to engage in a proxy contest is not under the facts of this case sufficient to trigger an obligation to disclose the existence of a proxy contest which has not yet materialized.

The dangers of a rigid rule are highlighted by the actual events in this case. In his May 7 conversation with Greenfeld, Ramsey informed him that plaintiffs intended to oppose two of the three management nominees, and would not oppose the candidacy of Mr. DeFrates. (PX 91 at 16; PX 57 at 5). In fact, plaintiffs' proxy solicitation announced that all three management nominees were being opposed. (PX 16). The Court does not question plaintiffs' good faith in making the May 7 representation, but cites this example merely to illustrate that telephone conversations are normally less reliable than written notification. It is not difficult to imagine other gaps in communications, with their resulting misinformation in proxy solicitations, were plaintiffs' theory adopted. In short, at the time TI's initial proxy materials were mailed, the company was not possessed of sufficient information regarding plaintiffs' candidacies to require disclosure under Rule 14a–9.[21]

## THE COUNTERCLAIM

### I. THE ALLEGED FAILURE BY PLAINTIFFS TO DISCLOSE THEIR TRUE OPINION OF TI MANAGEMENT

Plaintiffs concede that in the course of their meetings and correspondence with TI management in late 1978 and early 1979, Mr. Ling in particular praised a number of management's recent efforts. These included the "bargain" purchase of 50% of the shares of The Phoenix Resources Company, development of a successful drilling and exploration program, sale of TI's Well Servicing Division at a profit of approximately $40 million, and several others. (Ling Dep. Ex. 26 at 1–2). As Ling told TI Vice President DeFrates in a December 19, 1978 letter, "management has been most creative

and innovative in structuring the company's earning power." (Ling Dep. Ex. 10).

According to TI, plaintiffs' proxy materials that issued several months later painted a very different picture of management, giving "the false impression that [plaintiffs] believed TI management to be so incompetent that the company must be liquidated at once to prevent impending financial disaster." (TI Post-Trial Br. at 19). TI asserts that plaintiffs' true opinion of management was contrary to the one expressed in their proxy materials, thereby constituting a material misrepresentation in violation of § 14(a) of the Act and Rule 14a–9.

Plaintiffs' proxy materials state in pertinent part:

*If the Committee's Sale/Liquidation Proposal Is Not Implemented Promptly, the Committee Is Concerned Over the Possible Adverse Effect on the Market Prices of the Texas International Common Stock That May Result From the Operational Results Described in (i)–(iii) Below and the Company Policies Described in (iv)–(v) Below.*

(PX 16 at 3) (emphasis in original). Operational Results (i)–(iii) described TI's earnings performance during the past five years, a drop in TI's reported net worth, and a reduction in TI's retained earnings, respectively. Company Policies (iv)–(v) referred to TI's failure to pay a dividend in the last ten years, and to the fact that TI's Board of Directors had a majority of employee directors rather than outside directors.[22] (*Id.* at 3–4). The proxy materials did not claim that TI management was generally incompetent, nor did they question the wisdom of any of the transactions privately applauded by Ling.

Shareholders are entitled to know the true views of proxy contestants as to company policies that have become an

---

**21.** The Court does not suggest the plaintiffs' opposition was not material. Rather, prior to its written formalization, and resting solely on the incomplete oral notification given to TI on May 7, plaintiffs' opposition was not yet a "fact" requiring disclosure. The materiality of actual opposition to the election of directors

cannot be questioned. *See* Rule 14a-11, 17 C.F.R. § 240.14a-11.

**22.** None of these "Operational Results" or "Company Policies" were subjects on which plaintiffs had expressed a favorable view in their discussions with TI management.

issue in the proxy contest. *See National Home Products, Inc. v. Gray, supra,* 416 F.Supp. at 1314; *Chris-Craft Industries, Inc. v. Independent Stockholders Committee,* 354 F.Supp. 895, 910–11 (D.Del.1973). In the instant case, however, neither management's competence in general nor the transactions and policies previously complimented by Ling were in issue. Rather, plaintiffs were urging that the best prospective course for TI was adoption of their sale or liquidation proposal. This position was not contradicted by or inconsistent with plaintiffs' earlier praise for TI management. In this respect, plaintiffs' views of management set forth in its proxy materials was not false or misleading.

## II. THE ALLEGED FAILURE BY PLAINTIFFS TO DISCLOSE THEIR TRUE PLANS FOR THE COMPANY

■ Both sides agree that the central theme of the 1979 proxy contest was the dichotomy between plaintiffs' proposal to sell or liquidate TI and incumbent management's position that TI should remain an ongoing concern. Both sides also agree that election of plaintiffs' candidates to the TI Board of Directors would not, in itself, constitute shareholder approval of a sale or liquidation plan. Rather, separate authorizing votes by the Board and the shareholders were necessary before such a plan could be implemented. Nevertheless, TI contends that plaintiffs, in putting forth their campaign platform of sale or liquidation in their proxy materials, misrepresented certain material aspects of their plan, and omitted other material facts that were necessary to avoid misleading the shareholders.

TI asserts that plaintiffs' proxy materials claimed management had arbitrarily rejected a sound, well-financed offer by Gold Crown to acquire TI, when in fact no sound financing existed. TI further alleges that plaintiffs' proxy materials falsely conveyed a sense of urgency, and stated that management's position of maintaining TI as an ongoing concern was detrimental to the shareholders' interest, when in reality plain-

tiffs' "plan" called for a sale of only the non-energy assets, with plaintiffs owning TI's energy assets outright. Finally, TI contends that plaintiffs failed to describe the "bootstrap" nature of the Gold Crown acquisition, whereby TI's own assets would be pledged to secure the loans necessary to purchase all the outstanding shares of TI.

Plaintiffs argue in response that many of these facts were disclosed in their proxy materials. In addition, plaintiffs contend that the "plan" referred to by TI was merely one alternative under consideration, and that in any event, the shareholders were not voting to approve a plan of sale or liquidation, but were simply electing three directors. Consequently, any omissions or misrepresentations did not relate to the purpose for which the proxies were solicited, and need not have been disclosed under Rule 14a–9.

For the reasons stated *supra* at 654, plaintiffs' claim that TI misrepresented Gold Crown's financial capability (Part IX of Alleged Violations by TI), the Court finds that the Gold Crown offer did not stand on firm financial footing. This does not mean, of course, that plaintiffs could not attempt to convince TI's shareholders of the attractiveness of the offer despite its financing difficulties. However, having introduced the Gold Crown offer as an issue in the proxy contest by questioning management's rejection of it, plaintiffs assumed an obligation under Rule 14a–9 to disclose all material facts bearing on that issue. In this case, plaintiffs met that obligation.

Plaintiffs' proxy materials informed the shareholders that management had rejected the Gold Crown offer because it was not satisfied with Gold Crown's evidence of financial capability. (PX 16 at 12–13). Additionally, shareholders were told, "The financing commitments supporting the Gold Crown offer are subject to certain conditions." (PX 16 at 3). Shareholders were then referred to "Exhibit A" of the proxy materials, which contained the full texts of the Hambro and Bear, Stearns letters. (PX 16, Ex. A–2, A–3). Both letters declined to give "contractual assurances" that financ-

ing would be forthcoming. Both recited a variety of conditions that had to be met before financing was possible. In short, the shareholders were able to draw their own conclusions about the attractiveness of the offer, and plaintiffs, having disclosed these facts, were free to offer their opinion as to whether management should or should not have rejected it.

Plaintiffs were less forthright concerning other aspects of their acquisition plan. The Court has been presented ample evidence to support the conclusion that plaintiffs had developed the following plan to acquire TI. Gold Crown would purchase the 9.5 million outstanding shares of TI stock at a price of $18 per share. This purchase, along with incidental expenses, would result in an acquisition price of approximately $177 million. (Ling Dep. Ex. 21 at 1). The acquisition was to be financed with the nearly 500,000 TI shares owned by Ling and Bertoglio and with various loans, particularly those to be obtained through Hambro and Bear, Stearns. (TI Ex. 49; Tr. 597). These loans, most of which would be supported by TI's own assets, were to be repaid shortly after the acquisition was completed by selling TI's non-energy assets. (Tr. 565–68; Ling Dep. Ex. 27 at 3). The remaining energy assets valued at approximately $100–$120 million, would be owned by the Gold Crown investors. As plaintiffs envisioned the culmination of their plan:

> The sale of [the non-energy] assets will not impede or detract from the long term growth prospects of the remaining energy assets retained.

(Ling Dep. Ex. 9 at 1).

> \* \* \* \* \* \*

> The buyer of [TI] (Gold Crown Resources, Inc. or its partners) can recapture substantially all of their investment within days after closing and not [a]ffect the longer term viability of the surviving company.

(Ling Dep. Ex. 29 at 3).

In their proxy materials, plaintiffs told the shareholders that TI should not be continued as an ongoing concern.

> [Plaintiffs believe] *That the Best Way to Maximize Texas International Stockholders' Investment is Through a Sale of the Business at $18 Per Share or Better or, Alternatively, Through a Liquidation of the Business. If Elected, the Committee of Nominees Will Propose to the Board of Directors of Texas International a Sale or Liquidation of the Nature Described Above.*

> \* \* \* \* \* \*

> Gold Crown will reinstate its offer to the Board of Directors of Texas International and hold that offer open until June 15, 1979.

> \* \* \* \* \* \*

> [T]he Committee disagrees with Mr. Platt's conclusion that Texas International should be continued as an ongoing concern. . . .

(PX 16 at 2–3) (emphasis in original). While the solicitation of proxies was not for the purpose of approving or rejecting the Gold Crown offer, it is clear that the basis upon which shareholders were urged to vote for plaintiffs was their position on the sale or liquidation issue. A significant element of that position was plaintiffs' professed intent to restate the Gold Crown offer, carrying with it the unmistakable implication that the shareholders would benefit if TI accepted the offer. Thus, the Gold Crown offer was an issue in the proxy contest, and plaintiffs were required to disclose all material facts concerning it.

Plaintiffs' reliance on *Halle & Stieglitz, Filor, Bullard Inc. v. Empress International, Ltd.*, 422 F.Supp. 217 (D.Del.1977), cannot avoid this conclusion. There, a failure by incumbent directors to disclose in their proxy materials their plans to initiate a tender offer after their reelection was not a Rule 14a–9 violation, because the alleged omission did not relate to the purpose for which the proxies were sought. 422 F.Supp. at 223. *Halle & Stieglitz* did not involve a proxy contest between competing slates of candidates debating the merits of an issue of corporate policy, as was the case here.

The most glaring omission in the proxy materials was plaintiffs' failure to disclose their intention to retain TI's energy assets after the acquisition by Gold Crown. Plaintiffs had told the shareholders that they did not agree with management's opinion that TI should continue as an ongoing concern. They did not disclose, however, that there would be a "surviving company" in which plaintiffs would own approximately $100 million in energy assets.

Plaintiffs seek to avoid liability principally on two bases. They argue first that their proxy materials did disclose the possibility that Gold Crown would continue to operate a portion of TI's present business as an ongoing energy company. The proxy statement said:

> If Gold Crown should acquire Texas International, it anticipates the liquidation of some or all of the assets. However, Gold Crown would expect to reserve judgment as to such matter until such time as it and its representatives are given an opportunity to review and assess in detail the business and assets of Texas International.

(PX at 13). This statement was insufficient to apprise TI shareholders of the substantial assets that would remain in Gold Crown's possession after the acquisition debt had been repaid. Additionally, this noncommittal statement is belied by plaintiffs' own written plans for the company that were cited above. See General Host Corp. v. Triumph American, Inc., 359 F.Supp. 749, 756 (S.D.N.Y.1973).

Alternatively, plaintiffs contend that retention of the energy assets by Gold Crown was merely one of several possibilities under consideration by them. Plaintiffs point to a "working paper" drafted by Ling in April, 1979 in which he wrote, "It would be the prime objective of the investors to dispose or sell the newly acquired assets on an orderly basis. . . . " (PX 32 at 2). In addition, they cite a Briefing Memorandum prepared by Ling which included among the possible "corporate objectives after the TI acquisition is completed" the following:

> The sale of additional assets to retire all bank loans and public indebtedness then liquidate all of the balance of the assets and distribute the proceeds to the respective investors under the tax free distribution provisions of the Internal Revenue Code.

(Ling Dep. Ex. 45 at 5). In each instance, of course, the "investors" mentioned by Ling were not the present TI shareholders, but were instead the Gold Crown investors and any of their partners who joined in the venture.

The Court finds that neither plaintiffs' proxy statement nor the Briefing Memorandum overcomes the basic infirmity in plaintiffs' proxy materials. Whether Gold Crown planned to operate a surviving company that owned TI's energy assets or sell those assets and distribute the proceeds to Gold Crown's investors is unimportant. Plaintiffs sought the votes of their fellow shareholders based in large measure on a plan which they held out as the best method of maximizing the shareholders' investments. In fact, successful culmination of this plan would transfer approximately $100 million of the net value of TI to the plaintiffs, rather than distributing it among all the present TI shareholders. This fact would be of great importance to a reasonable shareholder in evaluating the honesty and loyalty of plaintiffs, and in gauging the manner in which they would discharge their fiduciary obligations if elected. Cohen v. Ayers, supra, 449 F.Supp. at 317; Securities & Exchange Comm. v. Henwood, [1961–1964 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 91,125, at 93,712 (S.D.Cal.1961), modified on other grounds, 298 F.2d 641 (9th Cir.), cert. denied, 371 U.S. 814, 83 S.Ct. 25, 9 L.Ed.2d 56 (1962).

Plaintiffs' actual intentions are graphically illustrated in a letter written by plaintiff Bertoglio, which states in pertinent part:

> I believe strength would quickly bring the matter to a head and allow us to maximize profits before one of three things happens, the stock price hedges up to $18 and the attractiveness to the investors on the streets is no longer an incen-

tive to be a follower of ours, or a $18 or $19 white knight will step in, or the possibility of [TI] putting the company into some type liquidation.

(Ling Dep. Ex. 76 at 2). Similarly, plaintiffs' candidate Shiftan testified that plaintiffs sought to move quickly before the stock moved up to $18 or a "white knight" stepped in. (Tr. 570). In other words, plaintiffs wanted to implement quickly the Gold Crown acquisition plan they were recommending to the shareholders so as to maximize their own profits rather than the shareholders' investments. Armed with this knowledge, a reasonable TI shareholder would be likely to question whose interests plaintiffs had in mind, and would therefore consider the information important in deciding how to vote. *TSC Industries, supra.* Accordingly, failure to disclose these facts constituted a violation of § 14(a) of the Act and Rule 14a–9.[23]

TI's contention that failure to disclose the "bootstrap" nature of the plan also violated the proxy rule is less persuasive. The Hambro and Bear, Stearns letters attached to plaintiffs' proxy materials (PX 16, Exhs. A–2 and A–3) at least suggest that TI's assets would be used to secure the loans needed to purchase the outstanding shares of TI. However, it is unnecessary to determine whether adequate disclosure was made, since the Court concludes the information was not material. In assessing a similar contention in *Lewis v. Oppenheimer & Co.,* 481 F.Supp. 1199 (S.D.N.Y.1979), Judge Pollack found no violation of Rule 14a–9, stating:

> Plaintiffs' argument implies that it is somehow suspect for a buyer to use an acquired asset as collateral for a loan, or that in so doing the buyer somehow derives a secret benefit to which he is not entitled. A buyer's use of an acquired asset, however, is his own concern.

*Id.* at 1207. In the instant case, Gold Crown's use of TI's assets to secure the necessary loans, unlike the undisclosed information discussed above, was not a fact that bore on the fairness of the acquisition plan to TI's shareholders. Had these other aspects of plaintiffs' plan been disclosed, a reasonable shareholder's decision was unlikely to be influenced simply by revealing the collateral for the loans. In the context of this proxy contest, the so-called "bootstrap" nature of the plan need not have been disclosed.

### III. THE ALLEGED FAILURE BY PLAINTIFFS TO DISCLOSE LING'S FINANCIAL "TRACK RECORD"

Texas International is not the first publicly held company in which Mr. Ling has shown an interest, nor is this case his first entanglement with the federal securities laws. In 1964, the S.E.C. brought an action against Ling in connection with his control of Electro-Science Investors, Inc. ("ESI"). Although Ling denied any wrongdoing, he agreed to pay over $200,000 to ESI and to refrain from serving as an officer or director of an investment company without first obtaining the S.E.C.'s permission. (Ling Dep. at 306–10). Since that time, he has served as a director or officer in several corporations which became financially-troubled under his stewardship, and has been a defendant in at least four separate lawsuits involving alleged securities violations.

Plaintiffs' proxy materials disclosed some, though not all, of Ling's financial history. TI shareholders were informed that Ling was President and Chairman of the Board of Omega-Alpha, Inc., and that Omega-Alpha is now bankrupt. They were told that Ling was a director of North American Acceptance Corporation

---

**23.** In so ruling, the Court rejects TI's contention that plaintiffs have violated Rule 14a–3 by failing to disclose the information required by Items 14 and 15 of Schedule 14A. Those disclosure requirements come into play only "if action is to be taken with respect to any plan for" a merger, consolidation or sale of all or substantially all of the assets of the issuer. 17 C.F.R. § 240.14a–101, Items 14 and 15. TI shareholders were not voting on a sale or liquidation of the Company. Rather, plaintiffs' liability for failure to disclose certain aspects of their proposal arises from the relationship between that information and the plaintiffs' qualifications to serve as directors. Consequently, Items 14 and 15 are inapplicable.

("NAAC"), and that it is also bankrupt. In addition, plaintiffs disclosed that Ling consented to a permanent injunction restraining him from selling NAAC promissory notes after the S.E.C. had charged him with violating the registration and anti-fraud provisions of the federal securities law. Finally, plaintiffs disclosed Ling's involvement in efforts by Danco, Inc., a company controlled by Ling, to make a tender offer for Contran Corporation in 1978. Ling and others were twice found to have violated the tender-offer provisions of the federal securities laws by the U.S. District Court for the Northern District of Texas. The proxy materials disclosed, among other things, the court's finding that Danco "acted culpably with intent to deceive," and "had made intentionally and materially misleading statements." (PX 16 at 8–9). In short, TI shareholders were presented with an unflattering, though arguably incomplete, picture of Ling's financial background.

TI contends that a great deal of material information was omitted, leaving the shareholders unaware of arguably relevant indicators of Ling's fitness to serve as a director of TI. TI challenges plaintiffs' failure to disclose:

(1) Ling's questionable involvement with ESI and his court-ordered agreement not to become a director or officer of an investment company without SEC permission; (2) that Ling was asked to resign from the LTV [Corporation] Board because of LTV's precarious financial condition and Ling's inability to manage his personal debts; (3) the relationship between Ling's removal from Omega-Alpha's Board and that Company's bankruptcy; (4) the coincidence of Ling's departure from NAAC and that company's bankruptcy; (5) securities fraud litigation commenced by NAAC's security holders against Ling and his associates; (6) the full breadth of the SEC's permanent injunction against Ling in the *NAAC* case; (7) a meaningful description of the *Con-*

tran litigation, including Ling's initial violations, Judge Hill's first opinion, Ling's repeated violations and Judge Hill's further injunction; and (8) the securities fraud litigation against Ling commenced by Contran's defrauded shareholders in the wake of his Contran dealings. (TI Post-Trial Br. at 40–41).

 Without question, § 14(a) of the Act and the proxy solicitation rules adopted by the S.E.C. require that shareholders be informed of relevant information regarding a nominee's business experience, involvement in legal proceedings concerning securities violations, and general fitness to hold office. *See Berkman v. Rust Craft Greeting Cards, Inc.*, 454 F.Supp. 787, 791–92 (S.D.N.Y.1978) (failure to disclose "track" record of director seeking reelection was material defect under Rule 14a–9); *National Home Products, Inc. v. Gray, supra*, 416 F.Supp. at 1315–16; Schedule 14A, Item 6, 17 C.F.R. § 240.14a–101 (incorporating Item 3 of Regulation S–K, 17 C.F.R. ¶ 229.20). In assessing the claimed Rule 14a–9 violation, the Court must determine whether the facts cited by TI, if disclosed by plaintiffs, would have "significantly altered the 'total mix' of information made available" to the shareholders. *TSC Industries, supra*, 426 U.S. at 449.

 Initially, plaintiffs respond that the second, third and fourth omissions claimed by TI lack record support. The Court agrees. TI has not established that Ling personally bankrupted Omega-Alpha or NAAC. Plaintiffs' disclosure of Ling's connection with each company and the fact that each is now bankrupt was adequate. Proxy solicitors need not disclose their opponents' characterization of the facts, so long as the facts themselves are disclosed. *See Golub v. PPD Corporation, supra*, 576 F.2d at 765. Similarly, TI has not shown that Ling left LTV in a "precarious financial condition." Absent proof that an omitted fact was true, there is no violation of Rule 14a–9. *Shapiro v. Belmont Industries, Inc.*, 438 F.Supp. 284, 290 (E.D.Pa.1977).[24]

---

**24.** This holding should not be construed as an approval of the omission of these facts if they

are true and can be proved. In this case, however, where record support is lacking, it is

■ TI's sixth and seventh claimed violations also must fail. The Court finds that plaintiffs' proxy materials fairly apprised the shareholders of Ling's adjudged violations of the securities laws. Inclusion of the additional details sought by TI would not have altered the "total mix" of information available to the shareholders.

■ In response to TI's three remaining claims, plaintiffs rest on the specific disclosure requirements of Schedule 14A. In particular, the ESI episode is said to be outside the five-year reporting period established by Item 3(f) of Regulation S–K, 17 C.F.R. § 229.20. The pending securities fraud suits commenced by the shareholders of NAAC and Contran are not final judgments, it is argued, and therefore need not be disclosed under Item 3(f)(4) and (5) of Regulation S–K. As stated earlier, *supra* at 27, Schedule 14A sets only minimum disclosure standards, and compliance therewith does not guarantee that a proxy statement satisfies Rule 14a–9. *Maldonado v. Flynn, supra,* 597 F.2d at 796 n.9; *Cohen v. Ayers, supra,* 449 F.Supp. at 317; *Lyman v. Standard Brands, Inc., supra,* 364 F.Supp. at 796.

■ The policy considerations underlying the S.E.C.'s adoption of a rule imposing a period of only five years for disclosure of business experience most likely revolve around the diminishing relevance of "ancient history." This is particularly true where a ten or fifteen-year old incident mars an otherwise unblemished record. Such a rationale is far less compelling in a case like the one at bar, where the ESI consent order in 1964 was the first in a series of securities law and business difficulties for Mr. Ling that continue until the present time. If TI shareholders had been informed of Ling's departure from ESI and the accompanying consent agreement, they would have been more likely to view him as a "recidivist" securities law violator. The Court is reluctant to conclude that this fact was not material to a shareholder's assessment of Ling's qualification to serve as a director.

Similarly, the pendency of securities fraud litigation commenced against Ling by the shareholders of NAAC (TI Ex. 25)[25] and Contran (TI Ex. 22; 23) would be material to a TI shareholder's evaluation of Ling. The allegations in these complaints relate directly to Ling's discharge of his fiduciary obligations and his forthrightness in certain securities transactions, rather than to matters wholly unconnected with the purpose for which the proxies were solicited. *See Lyman v. Standard Brands, Inc., supra,* 364 F.Supp. at 798. Even should Ling ultimately be successful in defending against these claims, TI shareholders were entitled to know that serious allegations, arguably bearing on his fitness for the office he sought, had been lodged against him. *See Robinson v. Penn Central Co.,* 336 F.Supp. 655, 658 (E.D.Pa.1971). Failure by plaintiffs to disclose these material facts was a violation of § 14(a) of the Act and Rule 14a–9.

## RELIEF

■ Plaintiffs seek a permanent injunction setting aside the election of Platt, DeFrates and Stults as directors at the May 31, 1979 Annual Meeting and ordering a new election to fill those three seats on the TI Board of Directors. Additionally, plaintiffs ask the Court to retain jurisdiction over this action for the purpose of determining their

---

unnecessary to reach the issue of the materiality of these omissions.

**25.** Plaintiffs have objected to the introduction of TI Exhibit 25 into evidence, claiming that it constitutes hearsay. However, the complaint filed by the NAAC security holders is not offered to prove the truth of the allegations contained therein, but rather to establish the fact that a lawsuit was filed against Ling. Accordingly, it is not hearsay.

The Court has reviewed all of the evidence submitted by the parties without regard to the existence of outstanding evidentiary objections. The evidence that has been relevant to a resolution of the issues in this case has been accompanied by record citations. Uncited evidence has not been relied upon for factual findings. It is therefore unnecessary to rule upon certain of plaintiffs' other evidentiary objections which involve uncited evidence. TI has no outstanding evidentiary objections.

claims for expenses incurred by them in connection with a new solicitation of proxies. Finally, plaintiffs request that costs be taxed against TI.

TI seeks a permanent injunction prohibiting plaintiffs from violating Section 14(a) of the Act and the rules promulgated thereunder by the S.E.C. in connection with any proxy solicitation involving TI, and from engaging in further efforts to secure financing for the acquisition of TI, whether by Gold Crown or another entity, until the "taint of their fraudulent conduct in the proxy contest has dissipated." TI also seeks a ruling entitling it to damages proximately caused by plaintiffs proxy violations, although resolution of the amount of such damages, if allowable at all, has been reserved for a subsequent proceeding. In addition, TI seeks an award of costs and attorneys' fees.

The Third Circuit Court of Appeals recently has reiterated the factors to be considered in determining whether an injunction should issue in a case involving securities violations. *S.E.C. v. Bonastia,* 614 F.2d 908 (3d Cir. 1979). These factors include the degree of scienter involved on the part of the defendant, the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of his conduct, the sincerity of his assurances against future violations, and the likelihood, because of the defendant's professional occupation, that future violations might occur. *Id.* at 912–913. In support of the injunctive relief requested in its counterclaim, TI has addressed each of these factors, particularly as they apply to Ling. Standing alone, TI's arguments would provide strong support for the entry of a permanent injunction. In light of TI's own proxy violations, however, their arguments do not stand alone, and it becomes unnecessary to engage in an examination of these factors.

An earlier case in this District addressed the question of relief where both parties had committed proxy violations. *Chris-Craft Industries, Inc. v. Independent Stockholders Committee, supra,* 354 F.Supp. at 921–22. There, now Chief Judge Latchum relied upon the doctrine of unclean hands in determining that neither side was entitled to the injunctive relief or damages it sought. He specifically declined to engage in a balancing process whereby the egregiousness of one party's violations could be said to outweigh the conduct of the other. *See also Gaudiosi v. Mellon,* 269 F.2d 873, 881 (3d Cir.), *cert. denied,* 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959).

As far as it can be applied to the instant case, this Court agrees with the reasoning of *Chris-Craft.* Each side has committed violations of the same Rules by which it seeks to impose liability on its opponent. Ordinarily the Court would be content to "leave the parties where they deliberately chose to place themselves." *Chris-Craft, supra,* at 922. However, this case differs from *Chris-Craft* in one critical respect. At the time *Chris-Craft* was decided, a new Board of Directors had been elected, replacing the directors whose election had been tainted by the proxy violations. In the instant case, the terms of the directors elected at the 1979 Annual Meeting will not expire until 1982.

"The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J. I. Case Co. v. Borak,* 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964). Protection of shareholders is the paramount concern of the statute and the rules adopted thereunder by the S.E.C. That interest would be disserved here by retention of the status quo.

> To apply the maxim [of unclean hands] in this case would produce the illogic of leaving the shareholders unprotected when they have been doubly misled, stultifying the underlying purpose of the national securities laws. Where a public interest is at stake, above the interests of the parties themselves, the protection of that paramount interest overcomes the judicial reluctance to assist a wrongdoer.

*Union Pacific Railroad Co. v. Chicago and North Western Railway Co.,* 226 F.Supp.

400, 410 (N.D.Ill.1964). Accordingly, the election of directors at the May 31, 1979 Annual Meeting of TI shareholders must be set aside, and a resolicitation of proxies to fill those seats must ensue. All other relief requested by the parties will be denied.

The foregoing Opinion shall constitute the findings of fact and conclusions of law required by Rule 52(a), Fed.R.Civ.P. An appropriate order will be entered.

### OPINION ON MOTION FOR REARGUMENT

MURRAY M. SCHWARTZ, District Judge.

Defendant Texas International Company ("TI") moved on March 11, 1980 for reargument of the Court's decision of March 7, 1980. That Opinion and Order found violations of the Securities and Exchange Act of 1934 ("Act"), 15 U.S.C. § 78n(a), and the proxy rules established thereunder, 17 C.F.R. § 240.14a–9, on the part of both TI and the plaintiffs, who were defendants on TI's counterclaim. All relief requested by the parties was denied, except that the May 31, 1979 election of the three TI Class I directors was set aside and a resolicitation of proxies was ordered. TI's motion for reargument does not address the Court's holding that TI violated the proxy rules, but is directed solely at the issue of relief.

TI contends that the relief ordered was inappropriate for four separate reasons. First, the doctrine of unclean hands precludes a new election ordered at the behest of "guilty" plaintiffs. Second, a weighing or balancing of the relative violations by plaintiffs and TI bars a new election. Third, a new election is inappropriate because the TI shareholders were not misled by TI's violations. Finally, subsequent events have rendered a new election unnecessary. These contentions are discussed below in varying detail.

Relying on *Gaudiosi v. Mellon*, 269 F.2d 873, 881–82 (3d Cir.), *cert. denied*, 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959), TI urges that application of the unclean hands doctrine to bar plaintiffs' request for relief was mandatory. *Gaudiosi* is distinguishable from the instant case in several respects. There the District Court found that the defendants had not committed the unlawful acts alleged by plaintiffs or otherwise violated the securities laws or regulations. *Gaudiosi v. Franklin*, 166 F.Supp. 353, 369–70 (E.D.Pa.1958). Thus, plaintiffs actually failed to prevail on the merits of their claims, although the court denied relief on the basis of plaintiffs' unclean hands. The Court of Appeals did not disturb the conclusion that defendants' conduct was lawful, 269 F.2d at 879, but chose nevertheless to affirm the District Court's ruling by approving its exercise of discretion in invoking the unclean hands maxim. Here, in contrast, TI was found to have violated § 14(a) of the Act and Rule 14a–9. In addition, the relief sought by the plaintiffs in *Gaudiosi* was invalidation of defendants' proxies. Had such relief been granted, plaintiff Phillips' election to office would have become an accomplished fact. Thus, in rejecting plaintiffs' contention that the rights of 23,000 shareholders were implicated, the Court of Appeals refused to enforce the purported right of the shareholders to have Phillips automatically elected to office, as opposed to their *statutory* right to participate in an election where all relevant information is before them. The relief awarded in the instant case, a new election, will not result in plaintiffs' election to office, but instead will "deprive the plaintiff of any benefit from its . . . wrongdoing and [will] wipe the slate clean for a new solicitation of all proxies." *Union Pacific Railroad Co. v. Chicago and North Western Railway Co.*, 226 F.Supp. 400, 411 (N.D.Ill. 1964).

In short, I do not read *Gaudiosi* as requiring mandatory application of the unclean hands doctrine in a case such as this. Rather, application of the doctrine resides in the discretion of the District Court.

> Whether the defense is allowed [in securities actions] should be determined by ascertaining whether the application or non-application of the defense will better promote the objectives of the securities

laws by increasing the protection afforded the investing public.

*Wolf v. Frank,* 477 F.2d 467, 474 (5th Cir.), *cert. denied,* 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973). *See also Union Pacific, supra,* 226 F.Supp. at 410.[1]

As to TI's second contention, the Court adheres to its original conclusion (March 7, 1980 Opinion at 57) that a balancing or weighing of the egregiousness of the respective violations by the parties ought not be undertaken. The Court simply notes by way of clarification that it does not share the view that TI's violations can be characterized as "marginal and technical."

In support of its third contention, TI urges that the rule enunciated in *Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 265 (3d Cir.), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972), prohibiting reliance on an opponent's proxy materials to cure a material omission in one's own proxy solicitation is limited in application to the question of liability for proxy violations and does not govern the issue of relief once a violation is established. Specifically, TI argues that a new election is inappropriate unless the TI shareholders have been actually misled by TI's omissions, and that the shareholders here have not been misled because of the references in plaintiffs' proxy materials to the information omitted by TI.

■ TI's argument is without merit for a number of reasons. The holding in *Kohn* has not been limited to the issue of liability, but has been applied where a new election has been ordered. *See Gladwin v. Medfield Corp.,* 540 F.2d 1266, 1270 (5th Cir. 1976). In addition, TI's contention that the shareholders were not misled is unsupported by the record. One of the more significant aspects of the vesting provisions of the stock option plan was their enactment immediately before one of the enumerated "total vesting events" became a viable option for shareholder consideration. Plaintiffs proxy materials, while they do set forth the aggregate amount accruing to management should a "total vesting event" occur, do not inform the shareholders about the nature or date of the changes made on February 27, 1979. Thus, plaintiffs' proxy materials, if considered at all by a TI shareholder, do not paint a complete picture of the information omitted by TI.

■ TI's final contention revolves around events that have taken place subsequent to the trial of this action, and for which there is no record support. TI asserts that the sale or liquidation plan proposed by the plaintiffs in May 1979 has become moot by virtue of the accomplished or intended sale of many of TI's non-energy assets, a rise in the price of TI stock above $20 per share, and a substantial change in the shareholder populace of TI occasioned by voluminous trading in TI stock in recent months. Accordingly, it is argued, a new election is inappropriate because new shareholders will be voting on issues different from those that faced the shareholders in May, 1979.

TI's argument must be rejected. As stated earlier, there is no record support for the facts alleged by TI. Further, to accept TI's theory requires the Court to speculate as to what the trading price of the stock will be at the time of the new election. More fundamentally, however, acceptance of TI's theory leads to the untenable result that subsequent unilateral actions by a proxy violator, or independent market forces, can preclude relief from an unremedied proxy violation whenever the myriad circumstances surrounding a tainted election cannot be recreated. Enforcement of § 14(a) and the rules promulgated thereunder would be seriously undercut were such a rule adopted.

Accordingly, TI's motion for reargument or for modification of the March 7, 1980 Opinion and Order will be denied.

---

1. The courts' consideration of unclean hands in both *Wolf* and *Union Pacific* impliedly assume *arguendo* that plaintiffs were guilty of wrongdoing and proceed nonetheless to reject application of the doctrine.